Decided 12 May, 1900.

## EX PARTE MILLER.

[ 60 Pac. 999.]

DISBARMENT OF ATTORNEY—OBSTRUCTING COURTS OF JUSTICE.*

An attorney who has advised and assisted his client to disobey an order of court requiring her presence before the judge, after the order had been served on the client, and she had generally appeared in answer thereto, is guilty of intending to cause a failure of justice and should be disbarred.

Disbarment proceedings by the State of Oregon, on the relation of Rangdina Rivers, against J. E. Miller, an attorney at law.          DISBARRED.

For the relator there was a brief and an oral argument by *Messrs. D. R. N. Blackburn*, Attorney-General, *Lionel R. Webster*, and *Thos. G. Greene*.

For the defendant there was a brief and an oral argument by *Messrs. John H. Raley* and *A. D. Stillman*.

PER CURIAM. This is a proceeding for the disbarment of the defendant, who is a regularly licensed attorney of this court. The information charges him with a violation of his official oath, a willful disobedience of the order of the court, and of willful deceit and misconduct in

---

*NOTE.—A note collecting many cases on the disbarment of attorneys for unprofessional conduct is printed in 45 Am. St. Rep., at pp. 81 and 82.

his profession.   The specifications, briefly stated, are as follows : That a judgment was given and rendered in the Circuit Court of the State of Oregon, for Umatilla County, in favor of one Emma M. Kenney and against Frank Rivers, the husband of the relator, for $850 ; that execution was issued thereon March 23, 1895, by virtue whereof the sheriff levied upon certain money of the judgment debtor in the hands of Rangdina Rivers, and on June 20, 1895, judgment was entered against her as garnishee for the sum of $365.50 in favor of the said Emma M. Kenney ; that on July 23 execution was issued on the garnishee judgment, and such supplementary proceedings were had in aid of said execution as that the Circuit Court of the State of Oregon, for Umatilla County, made an order requiring the said Rangdina Rivers to attend before it on the twenty-fourth day of July, 1895, at 7:30 o'clock P. M., to be examined touching her property ; that by the same order she was enjoined and restrained from making or suffering any transfer of, interference with, or other disposition of her property until the further order of the court ; that this order was served upon the defendant July 24, 1895 ; that the said Rangdina Rivers appeared at the time directed, with the defendant, J. E. Miller, as her attorney, and the examination was continued until July 27, 1895 ; that on the last-named date another continuance was had until the twenty-ninth of July, 1895 ; that at the time of these continuances the judge, in the presence of defendant, further ordered and directed that the said Rangdina Rivers should not dispose of any of her property, or leave the County of Umatilla, State of Oregon, and should appear for further examination on the twenty-ninth of July, 1895, at the hour of 9 o'clock A. M., which orders, in the presence and hearing of the judge of the court, she promised to

37 OR.— 20.

observe, and was thereby relieved of the necessity of giving bail for her appearance ; that the defendant was her attorney in all of these proceedings ; that on the night of July 27, 1895, while said orders were in force, the defendant went to her house and told her that she must not appear in said court on July 29, 1895, as directed, but that she should leave the county and state at once, and that she should not pay said garnishee judgment ; that, if she appeared in said court at the time mentioned, she would be asked three questions, the answers to which would convict her of a great crime and send her and her husband to the state penitentiary ; that she was alarmed by said advice, and, acting in obedience thereto, she left the state upon the night of July 27, 1895, and went to Nelson, British Columbia, where she took an assumed name, as advised by the defendant ; that the defendant agreed to send her certain personal property which she had left in his possession ; that prior to her departure the defendant went to Walla Walla, and advised her husband, Frank Rivers, to leave the state at once, for the purpose of avoiding the service of a warrant then out for his arrest ; that the said Miller did knowingly, willfully, fraudulently and unlawfully procure the absence of the said witness, Rangdina Rivers, on the twenty-ninth of July, 1895, with intent to unlawfully violate the orders of the circuit court, and to compass a failure of justice ; that the said Miller, instead of sending the personal property as he had agreed, divided the same between himself and others, and at divers times refused to send the same, or any part thereof, to her, and held it for ransom, exacting $30, which she did not owe him ; that said advice by Miller was given with intent to prevent said Rangdina Rivers from paying the garnishee judgment, and to convert her property to his own use ; that, while absent from the state by his advice, he wrote her a letter unbe-

coming an attorney and unprofessional in tone, for the purpose of blackmailing, intimidating and coercing her, through fear, to pay him money that she did not owe, and of preventing her from returning to Pendleton and repossessing herself of said property.

Analyzed, the charges consist (1) of unlawfully procuring the absence of the relator, an execution debtor, contrary to the order of the court requiring her to appear for examination at a time stated, with intent to cause a failure of justice ;* (2) of willfully and unlawfully obtaining from the said Rangdina Rivers the personal property described in the complaint, with intent to defraud her thereof and to wrongfully convert the same to his own use ; and (3) of endeavoring to extort money from her which she did not owe. The proofs having been submitted, we are to determine whether these charges, or any of them, have been established.

It appears by the records of the court, introduced in evidence, that Emma M. Kenney obtained a judgment in the Circuit Court of the State of Oregon, for Umatilla County, against Frank Rivers, for the sum of $760.20, with attorney's fees and costs, on March 23, 1895. Execution was subsequently issued, and a garnishee notice served upon the relator. On July 12 the execution creditor filed the following allegations and interrogatories, viz.: "That the said Rangdina Rivers on or about the twenty-ninth day of June, 1895, received of the defendant Frank Rivers the sum of $365.50, which sum of money was placed in the possession and keeping of the said

---

*Note.—Section 1017, Hill's Ann. Laws, provides: "An attorney may be removed or suspended by the supreme court for either of the following causes, arising after his admission to practice: * * * (3) For being guilty of any willful deceit or misconduct in his profession; (4) for a willful violation of any of the provisions of section 1038." Section 1038, Hill's Ann. Laws, has these provisions: "It is the duty of an attorney,— * * * (2) to maintain the respect due to the courts of justice and judicial officers."—Reporter.

Rangdina Rivers by the said Frank Rivers, and which money was the property of the said Frank Rivers; that the said Frank Rivers received the said money from the sale of a certain wheat receipt to one W. S. Byers, in the City of Pendleton, Umatilla County, State of Oregon, on or about the twenty-ninth day of June, 1895. The garnishee defendant, Rangdina Rivers, is requested to answer the following interrogatories: (1) Did you receive the sum of $365.50 on or about the twenty-ninth day of June, 1895, from the defendant Frank Rivers? (2) Did you not testify upon direct examination before T. G. Hailey, referee, in supplementary proceedings to execution in this action, that you received the said sum of $365.50 from the defendant Frank Rivers? (3) What have you done with the said sum of $365.50 which you so received from the said Frank Rivers? (4) Is the said sum of $365.50, or any part thereof, now in your possession or under your control? If so, where is it?" On July 13 Mrs. Rivers made answer, under oath, as follows: To interrogatories No. 1 and No. 2: "Yes." To interrogatory No. 3: "I had the money in my home, as I testified to in answer to one of your interrogatories on direct examination before Referee T. G. Hailey. That said money was in the house at the time I so testified, but has since been removed by some person other than myself, and without my authority or license, and I am unable to answer whether my husband, Frank Rivers, took the money from the house or not." To interrogatory No. 4: "No; I have not the said sum of $365.50, mentioned and described in plaintiff's interrogatories filed herein, or any part thereof. That I have not in my possession now, nor since July 9, 1895, said sum, or any part thereof, or any other moneys, goods, wares or chattels belonging to said defendant Frank Rivers. That I first discovered that the said money ($365.50) was gone from the

place where I kept it on July 8, 1895. That I am unable to say where said sum of $365.50, or any part thereof, now is. It is not in my possession.'' On July 23 judgment was rendered against her as garnishee, and in favor of Emma M. Kenney, for the sum of $365.50 and costs. Upon this judgment an execution was issued, and with reference thereto the following order was made, viz.: ''Motion having been made in this action for the examination of Rangdina Rivers, the above-named garnishee defendant, in supplementary proceedings to execution, and said motion coming on to be heard (S. A. Newberry and Bailey, Balleray & Redfield appearing for plaintiff), and based upon an affidavit of S. A. Newberry filed herein, it is ordered that the said Rangdina Rivers is hereby required, in pursuance of law, to attend before me at the court house in Pendleton, Umatilla County, State of Oregon, on the twenty-fourth day of July, 1895, at 11:30 o'clock A. M., to be examined concerning her property. It is further ordered that the said Rangdina Rivers and all other persons be, and they are hereby, enjoined and restrained from making or suffering any transfer of, or any interference with or disposition of, the property of the said Rangdina Rivers until the further order of this court. Done and dated in open court at the court house in Pendleton, Umatilla County, State of Oregon, this twenty-third day of July, 1895.''

This order was served upon Mrs. Rivers on the twenty-fourth, and the relator testifies that she appeared before the court at the time designated, but that the defendant did not then appear for her, he having gone to Walla Walla to see her husband, Frank Rivers, and because of his absence the further hearing was postponed until July 29 at 9 o'clock in the morning, and that the court then issued an injunction restraining her from disposing of her property, and directed her not to leave the

State of Oregon, on pain of arrest for contempt; that the relator next saw the defendant on July 25, told him of the order that had been made, and thinks she had the order and showed it to him; that on Friday evening following he told her that she would have to leave the state and go to British Columbia, and assigned as a reason therefor that there was a warrant out for her husband, and that if the sheriff could not secure his arrest he would arrest her, and probably confine her in jail for a year or so, but was likely to make short work of it and send her to the penitentiary; that there were three questions to be asked her, the answers to which would convict her and send her to the penitentiary; and, when asked what the questions were, he replied that she should not ask anything; that she should either choose between his advice, or go to the penitentiary. She further testifies that he told her she could not take anything with her, and that she must leave her property with him, and go beyond the United States, and take an assumed name; that he would secure a driver, with team and carriage, to take her out of town on Saturday evening at 9 o'clock; that he procured the carriage as promised, and that Mr. James and he accompanied her part of the way up the railroad track, some two miles, to where he had the carriage, from which place she was driven to Walla Walla, where she took the train for Spokane, proceeding on to Nelson, British Columbia; that when she arrived at Nelson she took the name of Mrs. A. C. Holmes, and directed defendant to write to her by that name; that before her departure she intrusted all her personal property to him,— part of it being left in the hands of T. E. James, and part with Mrs. Rouch; that he took away two bundles, which contained the best she had; that all of the property, valued at half price, would amount to about $1,000; the articles being the same as contained in the list made a

part of the information; that, although she had repeatedly requested the defendant to send the property to her, he refused to do so unless she would pay him the sum of $30, which she denies that she owed him, but that she subsequently consented to pay that sum on condition he would send the goods to her C. O. D., but that he still neglected to send them, and has since disposed of them. On cross-examination she testifies that the defendant had taken away most of her property before the twenty-fourth of July, but that, after she had been ordered not to dispose of it or to leave the state, he took away a satchel containing silverware and jewelry. T. E. James vaguely corroborates Mrs. Rivers' testimony, but, except as it pertains to matters which are practically admitted, his testimony is largely hearsay, and so indefinite as to render it of but little importance. No good result can therefore be obtained by a review of it here.

On August 4, 1895, the defendant wrote to Mrs. Rivers, under the name of Mrs. A. C. Holmes, at Nelson, British Columbia, as follows: "Yours of the thirty-first of July received yesterday, and in reply will say that I have understood warrants were out for the arrest of you and Frank, both; charging larceny against Frank, and charging you with aiding and assisting him in committing larceny. However, I cannot find out anything from any one in the sheriff's office. I have not heard a word from Frank, and still have my doubts whether I shall ever hear from him. I do not think safe for you to return to Spokane for a long time. If you can manage in some way to quietly pass through the place, and go on to Victoria or some of the coast towns, I think it would, without doubt, be better, but for the present I think you had better remain out of the United States. You might arrange after a few months to go to Colorado, where your brother is, without trouble. Redfield was very angry to

think that you had slipped from his hands, and left them nothing but the costs to pay, and get no returns therefrom. They had Mr. James up, to tell what [he] knew about your departure. But, of course, he had no information to give them. And that has been the end in that respect. They have not as yet taken any of your goods, but may attempt to do so the coming week. Be of good cheer, and make the best of your situation for the present, and they will, without doubt, try to do all they can; and, when they have finished, then we will act. Should you go to any new place, let me know at once, so that I can be on the lookout for breakers. Everything has worked well thus far in your escape from your persecutors. Now, don't let any rash move undo all that has been done." Subsequently, on October 11, he wrote again to her (directing the letter, "Mrs. R. Rivers, Nelson, B. C."), as follows: "I have been informed that you have made some threats concerning myself and others, and threat to make a confession.  *  *  *  Now, if you have gone so far as to make a threat against me or any of my friends, I will tell you that I will save you of all such trouble. I will go to Mr. Redfield and tell him that you left a lot of goods with me as a pledge for my fees, and that, if he will give me the $30 due me, he may have the goods and do as he chooses with them. Now, you nor no other person can say that I have ever betrayed any confidence reposed in me, either as attorney or friend (and I have been both to you); but, unless you apologize and make matters satisfactory at once, I shall not consider that I am under any further obligations to you, either as an attorney or friend, and will proceed at once to get my money out of the goods which I hold of yours. I would not have been as easy with you as I have been, but for the reason that I felt that your husband and Mr. Redfield, and those with him, had greatly wronged you.  *  *  *

I do not know of what you can confess, except that you left this state ; and, while I never have felt that you were to blame for matters as they were, I do not see why you should betray your friends and assist your enemies. Now, you give me written authority to open that little grip which I have, and make a list of everything which you pledged to me for my fees, and secure me the sum of $30 and all costs of expressage and duty upon goods, so that I will be safe, and you will have your goods shipped at once. This cannot be said to be in any wise unreasonable, by you or any one else. I will give you until the twentieth of this month, unless I should hear of some more threats. But, if there is no more of them, I will not offer your goods until after the twentieth to Mr. Redfield.''

Later on he wrote to Mr. J. F. Hume, at Nelson, British Columbia, as follows : '' There is a woman in your town with whom I had some business as her attorney, and she placed some goods with me as a pledge for my fees. She was in a very bad situation, and I took the property for two reasons : One was to keep those who were endeavoring to force the collection, which claimed at the time she had nothing whatever to do with, and that only her husband was responsible for ; and, further, to secure myself. And the agreement was that the property should not pass out of my possession until all claims which I might have against her was fully paid. There is $30 due me, and that is a very small amount for the labor performed. * * * Now, as soon as she complies with her own voluntary agreement, I am will [ing] and will be glad to send her her goods. There is a little grip, among other things, that she claims contains jewelry. It is locked, and I never have seen its contents. Now that she has requested me to send these goods C. O. D. to you, I will say this : That if she will send me a list of the ar-

ticles, and their probable value, and authority to open the package she claims contains jewelry, so that I may check it off and make the proper invoice to entitle it to pass the custom house, and secure me in some way against any liability for any of the charges upon the same, I will ship the goods to you at once C. O. D., for my fees, but not otherwise. I will inclose a letter with this, to her, which I hope you will see that she gets.'' And on October 12 he wrote again to Mrs. Rivers, as follows : '' Your insulting letter addressed to my wife was received by her to-day, and given to me for the purpose of answering, and in reply will say : Neither my wife or children have ever worn any garment or article that ever belonged to you or any of yours. But, upon the contrary, they have had to do without, on account of your not paying your honest debts. I have always thought up to this time that you were a lady, and had been greatly imposed upon by your husband, and entered into your defense believing that I was defending a lady who had no intention of doing a single wrong act. I am now compelled to believe that you are no better than the man you called your husband, and that in many respects you have been equally guilty as he. Now, you are wanted bad in this place for swindling, and as being an accomplice with your husband in all his escapades. And those who were chasing you up while I was thinking that I was defending an innocent woman claim that they have several good cases against you for false swearing. * * * Now, if you want your goods sent right away, give me your guaranty that my money is secure, and that I will be secure from any duty at the custom house and expressage upon your goods, and I will assure you that I will not delay sending you everything I have of yours, and be glad to do so. But any more nonsense or delay upon your part

means that I will turn them over to Mr. Redfield, who holds a judgment against you for $400 or $500, and will be glad to get even a part of it.''

The defendant testifies that the relator left with him a satchel containing silverware and jewelry, and two packages of goods, which he placed in a box and nailed up, and that all these goods were taken from him by the deputy sheriff of Umatilla County by virtue of an execution issued out of the circuit court in a cause wherein Peter West was plaintiff and Rangdina Rivers was defendant, and that they were sold at sheriff's sale, and the proceeds applied to the satisfaction of said execution; that he did not otherwise dispose of any of the goods; that the relator left goods with T. E. James and Mrs. Rouch, but that he had nothing to do with them, nor had he any control over them. He further testifies that he was in Walla Walla on the evening of the twenty-fourth of July, when Mrs. Rivers was required to appear in court; that he did not then appear for her; that she told him that the matter had been continued until the twenty-ninth, but that he could not find that such was the case from the records of the court; that the relator delivered the goods which he received from her into his possession several days before the order of the twenty-third was made or served upon her. He denies having advised or told her that she should not appear in the circuit court at the time of the alleged adjournment or any other time, or that he told her that, if she did appear, three questions would be asked her, the answering of which would send her to the penitentiary, or that he procured a driver, with team and carriage, to take her to Walla Walla, or that he advised her to go to British Columbia or to take an assumed name. He admits having written all the letters attributed to him and referred to herein, and he further testifies that she owed him $30 for pro-

fessional services, consisting of a charge of $10 for appearing in the proceedings supplemental to execution, and $25 for making a trip to Walla Walla at her instance to interview her husband; that, of these sums, $5.00 had been paid, leaving the balance due as above stated. He states the purpose of his trip to Walla Walla as follows: "Mr. Redfield and a number of persons had told me that if Mr. Redfield procured judgment against her, and it was not paid immediately, he would proceed against her for perjury, and the morning that the judgment was obtained against her I told her of the rumors that I had heard, and she had denied knowing where her husband was up till that time, but she said she received a letter from him that morning (he was in Walla Walla); and she also claimed that he had gone into her bureau drawer and stolen several hundred dollars, and that he had all her money; and I advised her to either go herself, or send some one, and get him to let her have enough money to satisfy that judgment; that she could do that quicker and easier than she could defend herself against a criminal prosecution. And that was the occasion of my being away at that time." He further says that she requested him to go, and there was nothing said about fees, but that he was acting as her attorney, and simply did it as part of his work. He testifies touching his charges that as soon as he looked into the papers he was satisfied that there would be considerable work to be done, and, she not having paid him the full amount of the $10 formerly charged, he thought it advisable to have some security for his fees for what he had done and was to do, and that she delivered certain property to him for that purpose, but at the same time she put in a number of things for safe keeping, and that he was careful to get the property before there was any judgment taken against her.

We come now to apply the proofs to the specifications, and determine whether they have been substantiated thereby. Mrs. Rivers was an execution debtor, and had been cited to appear on July 24 to be examined concerning her property. The order requiring her appearance contained also an injunction against her transferring or disposing of any of her property. The defendant was her attorney in the proceeding, and had been for some time. He had drawn her answer in the garnishee proceeding, and a judgment was obtained thereon against her for the amount of money alleged to be the property of her husband, and then in her possession; the defendant being present as her attorney when the judgment was entered, and having heard the announcement thereof in court. The judgment was evidently rendered on the twenty-third of July, although the findings of the court·bear date the twenty-fourth. The order for Mrs. Rivers' appearance for examination was undoubtedly made subsequent to the entry of this judgment, it being made in a proceeding supplementary to an execution issued upon the judgment. Of this order the defendant professes to have had no personal knowledge at the time, although Mrs. Rivers testified that she thinks she showed it to him. Mrs. Rivers appeared at the time designated in the order for examination, but the defendant was not then present; and she says the hearing was postponed because of defendant's absence until July 29, at 9 o'clock in the morning, and that the court directed her not to dispose of any of her property, nor to leave the state, in the meanwhile. No such order was entered of record, however, and it does not appear that anything further was done in the premises, and, so far as our knowledge goes, the matter is still pending. It is not altogether clear from the information which of these orders it was designed to charge the defendant with having caused the relator to disobey. The

alleged order requiring her not to leave the state seems never to have become a part of the records of the court in the cause, although there is evidence that it was verbally made and was announced by the court, and it is doubtful whether the charges can be sustained in so far as it was designed to make this order the basis thereof. But the order requiring her appearance for examination was still operative.   The relator had appeared in obedience thereto, and a postponement of the hearing was had ; but the order had not been revoked, and she was as much bound to its observance after as before the postponement, the date of appearance only being changed.   That the order of postponement was not entered of record ought not to change the condition, as it appears very clearly that such a postponement was had to the twenty-ninth of July, at the hour of 9 o'clock A. M.   The charges are broad enough to comprehend the willful procuring of a violation of this order, as well as the alleged verbal order ; and, if they have been proven in this particular, there is sufficient to support them.

The defendant admits that the relator told him the order had been made, and a postponement had.   This caused him to examine the records for the order and the entry touching the continuance, but he says he could not find anything to confirm what she said, and therefore claims that he was without knowledge of the action and requirements of the court.   Mrs. Rivers thinks she showed him the order, and it is quite probable such was the case ; for, having been served with it, as the return of the sheriff shows, it is very reasonable to suppose that she had not parted with it so soon thereafter, and that the defendant's purpose in looking at the record was to determine for himself what subsequent orders had been made touching the postponement, and relating to her further appearance.   Not finding any such, he may have

concluded that none had been made, notwithstanding her assertion to the contrary. But he was bound to take notice that the original order was in force, unless it had been vacated or discharged in the meanwhile. The defendant was well aware that the relator had left Pendleton, and was apprised of the manner of her going; for he accompanied her, according to his own admissions, to the place where the driver was waiting with a carriage to take her to Walla Walla, and helped her to enter the carriage. According to her testimony, he gave her a map, and marked the place where she was to go in British Columbia, and in this she followed his instructions. This he denies, but we find him writing to her under an assumed name very soon afterwards, at the point designated for her destination. Here is enough to show his complicity with the relator in her sudden departure from Pendleton for a place outside the jurisdiction of the United States. His letters, if there were nothing else in the record, are sufficient to show that he was culpably instrumental in procuring her nonappearance for further examination in obedience to the orders of the court. Perhaps it is not entirely patent that she left with the direct view of avoiding this especial order, or that such was his purpose in furthering her departure, but the effect was the same, and she was not absent for any legitimate purpose. The defendant denies that he advised her to leave at all; yet he admits that he imparted to her the information that she was liable to be arrested for perjury, and this lends color to the truth of her statement that he told her that, if she appeared in obedience to the order, certain questions would be asked her, the answering of which would send her to the penitentiary.

In his first letter, written seven days after her departure, he says: "I do not think safe for you to return to Spokane for a long time, * * * but for the present

I think you had better remain out of the United States. * * * Redfield was very angry to think that you had slipped from his hands, and left them nothing but the costs to pay, and get no returns therefrom. They had Mr. James up to tell what [he] knew about your departure. But, of course, he had no information to give them. And that has been the end in that respect. * * * Everything has worked well thus far in your escape from your persecutors. Now, don't let any rash move undo all that has been done." And again, when the relator had fallen out with him, and was pressing him to send her the goods which had been left with him, he writes : "Now, you are wanted bad in this place for swindling, and as being an accomplice with your husband in all his escapades. And those who were chasing you up while I was thinking that I was defending an innocent woman claim that they have several good causes against you for false swearing." These letters show, undeniably, the defendant's complicity with the relator's departure, and that such departure, if not expressly, was in part, for the purpose of avoiding further examination touching the money which she acknowledged receiving from her husband, and which she swore had been taken from her bureau drawer by some one unknown to her.

Without pursuing the matter further, we are of the opinion that the first specification of the charges has been amply proven. As it respects the other two, we think they have not. Whatever property was intrusted by the relator to the defendant was given into his charge before the order of July 23 was made. The essential part of this property was given to him as security for his fees, which she consented to pay him, so that we conclude the defendant was not guilty of defrauding her of the property, nor of attempted extortion from her of money that was not his due. In this connection it may be remarked

that the letters he wrote to her and to Mr. Hume indicate a very low estimate of the high duties which devolve upon an attorney, and of his just and honorable relations to his clients. There is here subject for reproof. But for the offense of procuring the absence of Mrs. Rivers in disobedience to the positive orders of the court, requiring her further examination in the proceedings supplementary to execution, he will be disbarred from practicing in the courts of this state, and such will be the order of the court. ORDER OF DISBARMENT.