COMMITTEE ON PROFESSIONAL ETH-ICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

William R. CRARY, Respondent.

No. 58926.

Supreme Court of Iowa.

Aug. 30, 1976.

Rehearing Denied Nov. 8, 1976.

Lee H. Gaudineer, Jr., and Hedo M. Zacherle, Des Moines, amicus curiae.

D. G. Ribble, Cedar Rapids, amicus curiae.

UHLENHOPP, Justice.

This proceeding involves a determination of charges of unethical conduct on the part of an attorney, respondent William R. Crary. The record establishes the following by a convincing preponderance of the facts and circumstances in evidence. See *Committee on Professional Ethics and Conduct v. Wright*, 178 N.W.2d 749 (Iowa).

Respondent, who was himself involved in litigation with his former wife over their children, became enamoured with Sue Evans Curtis, the wife of and mother of three children by Maury Wetzel Curtis. Respondent and Mrs. Curtis spent nights, weekends, and longer periods together, and engaged in sexual intercourse. Mr. Curtis and sitters attended the Curtis children during Mrs. Curtis' absences. At the time, respondent and the Curtis family resided in Cedar Rapids, Iowa, about four blocks apart.

Unknown to respondent and Mrs. Curtis, Mr. Curtis employed private investigators to observe Mrs. Curtis.

About March 13, 1970, Mrs. Curtis told her husband she was going to Vail, Colorado, to stay at Tivoli Lodge. Instead, she went to respondent's home on that date and stayed with him until March 22.

On April 29, 1970, Mrs. Curtis commenced a suit against her husband, seeking a divorce, custody of their children, alimony, and child support. She alleged that she had conducted herself as a dutiful and loving wife. Her attorney was Mr. William O. Gray, assisted by respondent who was then Mr. Gray's associate. Mr. Gray was unaware at the time of the relationship between respondent and Mrs. Curtis.

About May 15, 1970, Mrs. Curtis told a sitter that she was going to Chicago, Illinois. Instead, that day she went to Minneapolis, Minnesota, where she stayed with respondent until May 17.

On Wednesday, June 3, 1970, Mr. Justin W. Albright, attorney for Mr. Curtis in the divorce suit, commenced taking the discovery deposition of Mrs. Curtis at the office of Mr. Gray and respondent. In the course of this deposition in respondent's presence, Mrs. Curtis testified falsely regarding the period between March 13 and 22, 1970, when she was in respondent's home. Mrs. Curtis, respondent, and Mr. Albright knew the testimony was false, but Mrs. Curtis and respondent did not realize that Mr. Albright knew of the falsity. Mrs. Curtis did not assert the privilege against self-incrimination, but testified in part concerning the March 13 to 22 period:

Q. [by Mr. Albright] And as I understand it, you told Mr. Curtis that you were going to Vail, Colorado on this trip and that you were going to stay at the Tivoli Lodge, is that correct? A. That's correct. . . .

Q. Well, where did you go? A. I went to Chicago. . . .

Q. And well, where did you stay in Chicago? A. With a friend.

Q. Who is that? A. Mrs. Richard Needham. . . .

Q. And what's her address? A. Just a minute; I will look it up: 537 Rose Mary Road, Lake Forest, Illinois. . . .

Q. Well, did you stay with her all during the time that you were there? A. Uh-huh, yes.

Q. And who all did you see while you were there in Chicago? A. Friends of hers. . . .

Q. And as I understand it then, you stayed all that period of time, from March 13th until March 22nd when you returned home, with Mrs. Richard Needham in Chicago, is that correct? A. I did.

Q. Is that correct? A. Yes.

Q. And well, did you see anyone at all from Cedar Rapids while you were on this trip? A. No. Why would I see anyone from Cedar Rapids? . . . .

Q. Well, hadn't you previously arranged that Mary Becker would drive you to the airport there on Friday morning, March 13th? A. Yes. . . .

Q. Who did you leave with from Mary Becker's place, from 212 Twelfth Street, S.E., on the morning of Friday of March 13th? A. Mr. Crary. . . .

Q. And where did you go? A. Downtown. . . .

Q. You went to the Roosevelt Hotel to get a cab? A. Uh-huh, or a limousine, whichever one showed up first.

Q. And then he did not take you to the airport, is that correct? A. Oh, no; heavens no.

Q. Well, what airport did you land at in Chicago? A. O'Hare. . . .

Q. Well, how did you get from O'Hare Airport out to Mrs. Richard Needham's? A. I took a limousine into town.

Q. You went downtown then. How did you get to her place from downtown? A. I drove out with her later in the day. . . .

Q. Well now, on Sunday, March 15th, the Sunday after you left, you called home about 9:30 in the morning and talked with Mr. Curtis, did you not? A. Could be. . . .

Q. And you gave the impression that you were at Vail, Colorado? A. Why, of course. . . .

Q. Well now, on Sunday March 22nd, about 9:30 in the morning, you called your home and talked to Mr. Curtis didn't you? That's the day you came back . . . A. Yeah, it was the day I returned, yes.

Q. And didn't he ask you where you were, and you said you were still in Vail? A. Yup-yes. . . .

Q. And then he offered to meet the plane, did he not, and you said absolutely not? A. That's right. . . .

Q. Well on all these calls, I take it they were made from Lake Forest, Illinois? A. They were.

At no time during this portion of the deposition did respondent request a recess or interrupt the perjury.

At 3:00 p. m. on June 3, 1970, the parties recessed the deposition until 1:00 p. m. on Friday, June 5, 1970. During that interim, respondent, knowing that Mrs. Curtis' Wednesday testimony was false, took no measure to correct it, to withdraw from the case as an attorney, to warn Mrs. Curtis she should lie no further, to inform Mr. Gray of the perjury, or to reveal the true situation to anyone.

The deposition resumed on June 5 with the same individuals present. At that time Mrs. Curtis testified falsely regarding the weekend of May 15 to 17, 1970, which she actually spent in Minneapolis with respondent. Again Mrs. Curtis, respondent, and Mr. Albright knew the testimony was false, but again Mrs. Curtis and respondent did not realize that Mr. Albright knew it was false—until later in the deposition. Mrs. Curtis testified in part:

Q. [by Mr. Albright] Well, did you go with anyone? A. No.

Q. Well, just tell us where you went. A. I went to Chicago to see Mrs. Needham. . . .

Q. Well now, the second passenger who was right behind you was Mr. William R. Crary, was that correct, getting

off this flight? A. I have no idea who was getting off behind me. . . .

Q. Did you happen to see him on the plane on Ozark Flight No. 917? A. Not that I recall. . . .

Q. And then at the bottom of the steps after you got off the plane, you were observed to meet with Mr. William R. Crary and walked together with him into the terminal, is that correct? A. I don't remember. . . .

Q. Well, now, where did you board this Ozark plane on Flight No. 917 on May 17, 1970? . . . A. I told you I went to Chicago to see Mrs. Needham, and I came home.

Respondent did not seek to recess the deposition during this perjury or to halt Mrs. Curtis from falsely testifying.

As the deposition progressed, Mr. Albright's questions made evident that investigators had followed Mrs. Curtis and that Mr. Albright knew the truth. Respondent's testimony in later proceedings revealed what then happened at the Friday session of the deposition:

It became obvious, from the questions and the answers that I—or the questions that were being asked, that she had been followed by private detectives and that her former husband and her husband at that time [Mr. Curtis] knew everything that she had done and where she had been and who she had seen.

Q. Was the deposition then adjourned? A. Yes, it was. Actually what happened is that she became very shaken about the whole thing and asked to go to the ladies' room, and Bill Gray said, come on, let's go and find out about this. And he and I went into an office, and he said, is she lying about these things with you and with her? And I said, yeah, she is, and I was. And he said, we can't go on with this. She can't sit there and tell this story. And he said, what do you think we ought to do? And I said, I think we ought to recess the deposition, and we can't go on. I know we can't go on with it, no way. And so he went back into the office—or into the library, where we had

been taking the deposition, and I gather adjourned it or recessed it or whatever.

Respondent later testified additionally:

Well, the deposition, as I said, terminated sometime in the middle or late Friday afternoon. Saturday morning I went back down, and, of course, our office was open Saturday morning, so everybody was there, and I discussed it with Bill Gray, ran through the thing with him, and he said, well, I think you better tell the other members of the firm what has happened. He said, obviously we have got a really sticky mess on our hands. And I said, obviously we do. And so I went around and told Ray Stefani, Keith Stapleton, and B. D. Silliman what had occurred, that she had lied on her deposition and she had been seeing me and that I was sitting there in the deposition when she did it. . . .

Q. At that time had you formulated a plan as to what you should do, other than the fact that you were getting out of the case? A. Well, what I should do with regard to her testimony?

Q. Right. A. Well, the first thing that was necessary to do was to get her an attorney, because Bill said, I will not represent her any longer. I will have no part of it. You and I have to withdraw from the case, which we did.

Mrs. Curtis thereupon obtained other counsel, and in subsequent proceedings she testified that her testimony at the deposition was false.

In the divorce suit, Mr. and Mrs. Curtis entered into a stipulation giving Mr. Curtis custody of their three children, and the district court decreed Mr. Curtis a divorce and adopted the stipulation as part of the decree. Soon afterward respondent and Mrs. Curtis married.

Mrs. Curtis—we will continue to call her that though she became Mrs. Crary—then set about with the help of respondent to nullify the part of the decree granting Mr. Curtis custody of the children. No argument exists about the oldest of the three children; he is with Mr. Curtis, desires to

be there, and the parties are willing to let that arrangement stand. But by various maneuvers, including manipulation of the children, Mrs. Curtis, abetted by respondent, got the two younger children back with her. On her application, the district court eventually modified the original decree by granting her custody of those two children, but on appeal we reversed. *Crary v. Curtis*, 199 N.W.2d 319 (Iowa).

Various district judges assigned to the case endeavored to carry out the decree on custody, but Mrs. Curtis, aided by respondent, was determined to defeat it, and defeat it in fact she and respondent ultimately did. Mrs. Curtis however is not now on trial; respondent, as attorney, is. The question in this part of the case relates to the role if any respondent played in bringing the custody order to naught.

Our examination of the evidence leads us to find that respondent guided the successful effort to nullify the order on custody. Respondent would have us believe that he played only a passive part and that the headstrong Mrs. Curtis dominated the action, but too many circumstances in evidence point the other way. We mention three of them.

At one point a district judge ordered the sheriff physically to convey the two younger children from the home of respondent and Mrs. Curtis to the home of Mr. Curtis, pursuant to the decree. Arrangements were made by someone, however, to have several friends including children come to respondent's home, to have bicycles on hand, and to have a professional photographer present. The two children obediently went to Mr. Curtis' home, but then immediately came back to respondent's home amid picture-taking. We believe that respondent was behind the staging of this stunt.

On another occasion a concerted effort was made by a district judge to get the younger son to stay with Mr. Curtis. Mrs. Curtis thereupon took the son to California. Respondent contends this was the action of Mrs. Curtis, but the evidence shows indisputably that he financed the California trip.

A third circumstance occurred when respondent personally became involved. He has continually urged that he really did not control the Curtis children and could not tell them where to be. But on an occasion when respondent himself became embroiled in legal proceedings—initial steps in this disciplinary case—he needed the younger Curtis boy's presence in Iowa from California. He had no trouble getting the boy here. The incident constitutes telltale evidence of where control actually lay.

After most of these events had transpired and others too numerous to relate, the Committee on Professional Ethics and Conduct of The Iowa State Bar Association investigated the case and then filed a complaint against respondent before the Grievance Commission of this court. The Committee charged respondent with unethical conduct in connection with (1) the perjury incident, (2) the frustration of the custody decree, and (3) a combination of the first two. In the present proceeding we find no necessity to consider the third count.

The Third Division of the Commission heard the case and held regarding the perjury incident that respondent was relieved from reporting the perjury because of his privilege against self-incrimination and because the opposing party knew the testimony was false. The Commission held regarding the second count that respondent condoned Mrs. Curtis' acts in frustrating the decree. The Commission also held, "Respondent has committed certain acts of misconduct involving moral turpitude and placed himself where his silence or inaction could be misinterpreted as counseling violation of Court orders." The Commission reprimanded respondent.

The Commission accordingly made its report to this court and served the report on respondent, pursuant to our rules. Neither party took exceptions or an appeal.

Our preliminary examination of the report suggested possible disagreement with the Commission's decision. We therefore set the case for oral argument and invited briefs from the parties. We have now heard the parties orally and examined their

briefs. The Committee argued before us that respondent should receive severer discipline, while respondent urged the contrary. We find that we cannot accept the Commission's findings, conclusions, and disposition.

The case presents four principal issues: (1) What dispositional alternatives are available to us when the Commission reprimands and neither party takes exceptions or appeals? (2) Was respondent's conduct unethical in connection with the perjury? (3) Was respondent's conduct unethical in connection with frustration of the custody order in the decree? and (4) If respondent committed unethical conduct, what discipline should be administered?

I. *Dispositional Alternatives.* The first principal issue involves two subsidiary problems.

A. Our rules contemplate that the Commission after hearing on a complaint shall (a) dismiss the complaint, or (b) reprimand the attorney, or (c) recommend to this court that the attorney's license be suspended or revoked. In the case of (b) or (c), the Commission makes a report to this court, and the Committee or the attorney may take exceptions or an appeal. If neither party takes exceptions or appeals, this court proceeds "to determine the matter." Court Rule 118.10. Court Rules 118.9 and 118.10 make clear that course of procedure:

118.9. At the conclusion of a hearing upon any complaint against an attorney the Grievance Commission shall dismiss the complaint, or reprimand the attorney, or recommend to this Court that the license to practice law of the accused attorney be suspended or revoked. *If the Grievance Commission reprimands the attorney or recommends suspension or revocation of the attorney's license, it shall report to this Court, in writing, its Findings of Fact, Conclusions of Law, and Recommendations.* The Commission may permit a reasonable time for the parties to file post hearing briefs and arguments. The disposition or report of the Commission shall be made or filed with this Court within thirty days of the date set for the filing of the last responsive brief and argument. If the Commission cannot reasonably make its determination or file its report within such time limit, it shall report that fact and the reasons therefor to the parties and the Clerk of this Court. Any determination or report of the Commission need only be concurred in by a majority of the Commissioners sitting. Any Commissioner has the right to file with this Court his or her dissent from the majority determination or report. Such matter shall then stand for final disposition in this Court. If the Grievance Commission dismisses the complaint, no report shall be made to this Court, except as provided in Rule 118.19. Any report of reprimand or recommendations for license suspension or revocation shall be a public document upon the filing thereof with the Clerk of this Court. (Italics added.)

118.10. Any report filed by the Grievance Commission with this Court shall be served upon the attorney concerned as provided by the Rules of the Grievance Commission. Such report shall be entitled in the name of the Complainant versus the accused attorney as the Respondent. *If no exceptions are filed or no appeal is taken as hereinafter provided in these Rules, the Court shall proceed to determine the matter.* (Italics added.)

We hold that in cases postured like the present one this court may, after calling for briefs or oral argument if a substantial departure from the report may be made, reject or change the Commission's findings, conclusions, or disposition and make new ones, and increase or decrease the discipline to be administered. Rule 118.10 empowers us to determine the matter, and "determine" means adjudicate an issue, settle by authoritative sentence, decide. *Glenn v. Mitchell,* 71 Colo. 394, 207 P. 84; *Eastman Kodak Co. v. Richards,* 123 Misc. 83, 204 N.Y.S. 246. Our responsibility in this case, therefore, is to decide the matter.

B. Before doing so, however, we consider the scope of the charges. The Com-

mission stated that respondent "committed certain acts of misconduct involving moral turpitude. . . ." We are unable to discern whether the moral turpitude contemplated by the Commission was respondent's committing adultery or his condoning Mrs. Curtis' frustration of the decree. We think the words "moral turpitude" more likely refer to the adultery.

■ The problem here, however, is that our reading of the complaint indicates the Committee did not charge respondent with sexual misconduct, but with misconduct relating to the deposition and the decree. We stay within the general frame of the complaint, unless a new or amended complaint is filed and the proceeding starts over. We therefore do not ground our decision on the sexual misconduct in determining whether the Committee proved its charges.

Neither do we ground our decision on whether respondent committed unethical conduct by participating as an attorney in a case involving his own misconduct, or in permitting his firm to do so. The complaint does not contain such a charge. We thus limit our determination to the deposition and decree issues, which definitely are in the case.

II. *The Deposition Perjury.* The charge involving perjury also presents two subsidiary problems.

A. The first problem is procedural. Count I of the complaint sets forth in considerable detail the facts relating to the perjury and respondent's connection with it. A person of ordinary intelligence would readily perceive the gravamen of that count. As a conclusion, the Committee alleges that complainant violated specified statutes in the Iowa Code and also specified clauses of the Iowa Code of Professional Responsibility for Lawyers.

Section 610.14(3) of the Iowa Code prescribes as one of the duties of an attorney:

It is the duty of an attorney and counselor: . . .

3. To employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with

truth, and never to seek to mislead the judges by any artifice or false statement of fact or law.

Then § 610.24(3), which is one of the statutes specified by the Committee, provides:

The following are sufficient causes for revocation or suspension [of an attorney's license]: . . .

3. A willful violation of any of the duties of an attorney or counselor as hereinbefore prescribed.

Respondent contends that Count I of the complaint must fail because the Committee founded it on the Code of Professional Responsibility, which was not in effect when the perjury occurred.

We would doubt the soundness of respondent's contention that Count I must fail even if § 610.24(3) of the Iowa statutes were not alleged by the Committee. But we need not go that far. The statute is alleged. We therefore place the Code of Professional Responsibility aside as a basis for decision and proceed under the statute.

B. The second problem involves the merits of the charge relating to the perjury.

What are the *facts* of the matter? Mr. and Mrs. Curtis were husband and wife, lived together, and had three children. Respondent began to see Mrs. Curtis and stayed with her at various places and slept with her—both before and after Mrs. Curtis commenced her divorce suit against Mr. Curtis.

After Mrs. Curtis commenced that suit, defense counsel in that case took her discovery deposition. Respondent, as associate of Mr. Gray, assisted with Mrs. Curtis' case. Respondent personally knew of Mrs. Curtis' misconduct, for he himself was her paramour. This was at a time when recrimination was a defense to divorce, and Mrs. Curtis' conduct would be in issue. *Nichols v. Nichols,* 257 Iowa 458, 133 N.W.2d 77. Moreover, the suit involved child custody, which in turn involved the spouses' conduct. *In re Dawson's Marriage,* 214 N.W.2d 131 (Iowa). These are basic legal principles which a practicing attorney handling the divorce case would have in mind. But more

than that, respondent had been personally involved in child custody litigation himself. He must have considered these legal principles; Mrs. Curtis faced a discovery deposition and respondent was himself sexually involved with her.

Yet in the present disciplinary proceeding, respondent testified:

Q. At the time of the deposition on June 3rd and 5th of 1970 and immediately prior to that, had you in any way discussed with Sue Crary what her testimony should be with reference to your association with her? A. No. Didn't come up.

We do not believe this testimony that the matter did not come up.

Respondent also testified:

Q. When the questions were asked to which she gave false answers, what did you do? A. I sat there.

Q. Was it a surprise to you? A. Yeah. I had fully expected them to go into her background. She had been married for 17 years to Mr. Curtis, and obviously over 17 years many things happen, and I expected them to explore into their relationship and what was going on there. When they switched over into what she was doing two months after she filed for divorce and that sort of thing, it caught me by surprise, it caught her by surprise, I'm sure. At least she said it did afterwards. That seemed to be the tenor of the examination, as to what she was— done following the time she filed for divorce.

We do not believe this latter answer either.

Respondent contends, however, that the record contains no express testimony by him or Mrs. Curtis that he put her up to the false stories she related in the deposition. Yet those stories did not come out of thin air; they took some contriving. We doubt that Mrs. Curtis simply developed those stories about Mrs. Needham as the deposition progressed or that she developed them alone.

We think respondent was involved in the whole shameful episode, but we will accept arguendo his contention that he did not contrive the perjury with Mrs. Curtis. Then we have a situation in which respondent as an attorney at a deposition listened, his client started to lie under oath, he knew she was lying, and he just "sat there" and let her lie. More than that, the deposition recessed over Thursday, and respondent did nothing to stop Mrs. Curtis from lying some more. She resumed her lying on Friday and respondent still just sat there.

■ What is the *law* of this matter? We are not disposed to read §§ 610.14(3) and 610.24(3) of the Iowa Code in a narrow, technical, or legalistic manner. Assuming respondent did not know in advance that Mrs. Curtis was going to lie, his guilt was in failing to stop her or otherwise to call a halt when she started to lie.

Central to the administration of justice is the fact-finding process. Legislatures and courts can devise the finest rules of law, but if those rules are applied to false "facts," justice miscarries.

■ The attorney functions at the heart of the fact-finding process, both in trial and in pre- and post-trial proceedings. If he knowingly suffers a witness to lie, he undermines the integrity of the fact-finding system of which he himself is an integral part. Thus the fundamental rule is unquestioned that *an attorney must not knowingly permit a witness to lie. In re Hardenbrook,* 135 App.Div. 634, 121 N.Y.S. 250, affd. 199 N.Y. 539, 92 N.E. 1086, app. den. 144 App. Div. 928, 129 N.Y.S. 1126 (disbarment where attorney learned after first day of trial that client lied, but nevertheless recalled client to testify on second day); *In re Crary,* 223 App.Div. 277, 228 N.Y.S. 340; *In re Barach,* 279 Pa. 89, 123 A. 727 (disbarment where attorney permitted witnesses to testify they were present at injury when he knew they were not present); 7 C.J.S. Attorney & Client § 23 at 753–754 ("There is no recognized rule of law or ethics which justifies the conduct of counsel in any case, civil or criminal, in endeavoring by dishonest means to mislead the court or jury, even

if to do so might work to the advantage of his client, and such conduct will constitute a ground for suspension or disbarment. . . . An attorney may be suspended or disbarred for perverting, or attempting to pervert, a decision of a cause on the merits, by . . . introducing evidence or *allowing evidence to be given* which he knows to be false or forged"—italics added).

But respondent contends he was not required to volunteer to opposing counsel or the court that Mrs. Curtis' testimony was false, since this could have provided evidence for building an adultery case against him. He cites authority that an attorney like others is privileged not to produce evidence which will incriminate him. *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574.

Respondent does not seem to grasp the point here. We do not place the decision on respondent's failure to inform opposing counsel or the court of the truth. In the present case no need really existed for this. Opposing counsel was not misled. His subsequent questions revealed he knew the facts; he made Mrs. Curtis' perjury patent. The vice of respondent's conduct was not in failing to reveal the truth but in participating in the corruption of the fact-finding system by knowingly permitting Mrs. Curtis to lie. Indeed if Mr. Curtis had not had private investigators, the falsity of this testimony might never have come to light; Mrs. Curtis' perjury, countenanced by respondent, might have subsequently carried the day in court. Contrast with respondent's conduct the acts of Mr. Gray. When that attorney suspected on Friday that Mrs. Curtis was lying he confronted respondent and upon learning the truth said, "She can't sit there and tell this story." He thereupon recessed the deposition.

Apart from self-incrimination, respondent contends that his duty to protect his client, Mrs. Curtis, conflicted with his duty to the justice system to divulge the falsity, and that he properly placed his duty to his client first. He bases this contention on the attorney-client privilege.

Respondent confuses the duty to divulge the truth after perjury is committed with the duty not to permit a witness to give false testimony in the first place. We will proceed on this contention, however, on respondent's basis, as though respondent's breach was in not divulging the truth to opposing counsel or the court after the false testimony was given. We address respondent's contention as he does under the attorney-client privilege and without reference to any other privilege.

The difficulty with respondent's contention is that it proceeds from a false premise. He cites the article entitled Perjury, The Lawyer's Trilemma, in *Litigation* (Winter 1975 Journ. of A.B.A. Litigation Section). From this article, he concludes that a conflict between two duties exists: one to the client, the other to the justice system.

The flaw in respondent's reasoning is that no duty exists to the client when the client perjures himself to the knowledge of the attorney. Such conduct by the client falls outside the attorney-client relationship. When a prospective client approaches an attorney, he may expect that the attorney will assist him to the best of the attorney's ability. He may not expect, however, that the attorney will tolerate lying or any other species of fraud in the process. Prior to the present Code of Professional Responsibility, Canon 15 stated:

Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class and to deprive the profession of that full measure of public esteem and confidence which belongs to the proper discharge of its duties than does the false claim, often set up by the unscrupulous in defense of questionable transactions, that it is the duty of the lawyer to do whatever will enable him to succeed in winning a client's cause. . . .

The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client.

Canons of Professional Ethics (A.B.A. 1957).

Correspondingly, the present rules state that "A lawyer shall not . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation," "[e]ngage in conduct that is prejudicial to the administration of justice," "[p]articipate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false," or "[c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." Iowa Code of Professional Responsibility for Lawyers (1971) DR1–102(A)(4) and (5), DR7–102(A)(6) and (7).

We hold that respondent acted unethically in knowingly permitting Mrs. Curtis to commit perjury on the first day of the deposition and to resume the perjury two days later, and that in so doing, he violated §§ 610.14(3) and 610.24(3) of the Iowa Code.

III. *Frustration of Decree.* The issue under the second count of the complaint, dealing with the child custody order in the Curtis divorce decree, is largely factual. Here again respondent ascribes to us a naivete which is not altogether the fact. He would have us believe that Mrs. Curtis and the children were the ones who brought down the decree and he had no role in the process.

Shortly after the divorce court passed the decree, respondent and Mrs. Curtis married. From then on, respondent and Mrs. Curtis lived together and much of the time one or both of the two younger children lived with them. A definite pattern of conduct aimed at nullifying the custody order emerged from numerous acts of respondent and Mrs. Curtis. Our review of the evidence abidingly persuades us that respondent participated in the successful effort to terminate the custody order in fact. The Commission found that respondent "condoned" Mrs. Curtis' acts to that end; we find further from the facts and the circumstances that he acted in concert with her in the enterprise. Circumstantial evidence can be powerful proof, and it is powerful here. *State v. DeRaad,* 164 N.W.2d 108 (Iowa).

An attorney may of course challenge a decree of a court by motion, appeal, or other legal means, but as long as the decree stands he must abide by it. *Fisher v. Pace,* 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569; see *Maness v. Meyers,* 419 U.S. 449, 94 S.Ct. 584, 42 L.Ed.2d 574; *In re Daly,* 291 Minn. 488, 189 N.W.2d 176. In like manner he must not counsel others to disobey decrees or be a party with them to disobedience. *Territory v. Clancy,* 7 N.M. 580, 37 P. 1108; *In re Apfel,* 202 App.Div. 76, 195 N.Y.S. 325; *Ex Parte Miller,* 37 Or. 304, 60 P. 999. Respondent violated the latter principle here.

We hold that respondent acted unethically in proceeding in concert with Mrs. Curtis to nullify the custody decree, and that in so doing he violated §§ 610.14(1) and 610.24(3) of the Iowa Code.

IV. *Discipline.* Reprimand is wholly inadequate discipline in this case. Respondent participated in the debasement of the fact-finding process and he took part in the overthrow of a decree of a court. His conduct was diametrically opposed to the fundamental duties of attorneys to bring truth rather than untruth to light and to uphold rather than bring down the judgments of courts.

The first requisite of an attorney is basic character. Uppermost in our minds is the question whether respondent possesses the character necessary to qualify him as an attorney.

We have placed in the balance all of the factors shown in evidence. After doing so, we conclude that respondent's license should be revoked, and we so order.

LICENSE REVOKED.

All Justices concur except RAWLINGS and REES, JJ., who take no part.