NIX, WARDEN *v.* WHITESIDE

No. 84–1321.   Argued November 5, 1985—Decided February 26, 1986

158

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, *post*, p. 176. BLACKMUN, J., filed an opinion concurring in the judgment, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 177. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 190.

*Brent R. Appel*, Deputy Attorney General of Iowa, argued the cause for petitioner. With him on the briefs were *Thomas J. Miller*, Attorney General, and *Thomas D. McGrane*, Assistant Attorney General.

*Patrick Reilly Grady*, by appointment of the Court, 471 U. S. 1097, argued the cause and filed a brief for respondent.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Sixth Amendment right of a criminal defendant to assistance of counsel is violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at his trial.[1]

---

*Briefs of *amici curiae* urging reversal were filed for the Legal Foundation of America by *Jean Fleming Powers* and *David Crump;* and for the National Association of Criminal Defense Lawyers by *Michael L. Bender* and *Bruce M. Lyons.*

*John C. Shepherd, Michael Franck*, and *George Kuhlman* filed a brief for the American Bar Association as *amicus curiae.*

[1] Although courts universally condemn an attorney's assisting in presenting perjury, Courts of Appeals have taken varying approaches on how to deal with a client's insistence on presenting perjured testimony. The Seventh Circuit, for example, has held that an attorney's refusal to call the defendant as a witness did not render the conviction constitutionally infirm where the refusal to call the defendant was based on the attorney's belief that the defendant would commit perjury. *United States* v. *Curtis*, 742 F. 2d 1070 (1984). The Third Circuit found a violation of the Sixth Amendment where the attorney could not state any basis for her belief that defendant's proposed alibi testimony was perjured. *United States ex rel. Wilcox* v. *Johnson*, 555 F. 2d 115 (1977). See also *Lowery* v. *Cardwell*, 575 F. 2d 727 (CA9 1978) (withdrawal request in the middle of a bench trial, immediately following defendant's testimony).

# I

## A

Whiteside was convicted of second-degree murder by a jury verdict which was affirmed by the Iowa courts. The killing took place on February 8, 1977, in Cedar Rapids, Iowa. Whiteside and two others went to one Calvin Love's apartment late that night, seeking marihuana. Love was in bed when Whiteside and his companions arrived; an argument between Whiteside and Love over the marihuana ensued. At one point, Love directed his girlfriend to get his "piece," and at another point got up, then returned to his bed. According to Whiteside's testimony, Love then started to reach under his pillow and moved toward Whiteside. Whiteside stabbed Love in the chest, inflicting a fatal wound.

Whiteside was charged with murder, and when counsel was appointed he objected to the lawyer initially appointed, claiming that he felt uncomfortable with a lawyer who had formerly been a prosecutor. Gary L. Robinson was then appointed and immediately began an investigation. Whiteside gave him a statement that he had stabbed Love as the latter "was pulling a pistol from underneath the pillow on the bed." Upon questioning by Robinson, however, Whiteside indicated that he had not actually seen a gun, but that he was convinced that Love had a gun. No pistol was found on the premises; shortly after the police search following the stabbing, which had revealed no weapon, the victim's family had removed all of the victim's possessions from the apartment. Robinson interviewed Whiteside's companions who were present during the stabbing, and none had seen a gun during the incident. Robinson advised Whiteside that the existence of a gun was not necessary to establish the claim of self-defense, and that only a reasonable belief that the victim had a gun nearby was necessary even though no gun was actually present.

Until shortly before trial, Whiteside consistently stated to Robinson that he had not actually seen a gun, but that he was

convinced that Love had a gun in his hand. About a week before trial, during preparation for direct examination, Whiteside for the first time told Robinson and his associate Donna Paulsen that he had seen something "metallic" in Love's hand. When asked about this, Whiteside responded:

"[I]n Howard Cook's case there was a gun. If I don't say I saw a gun, I'm dead."

Robinson told Whiteside that such testimony would be perjury and repeated that it was not necessary to prove that a gun was available but only that Whiteside reasonably believed that he was in danger. On Whiteside's insisting that he would testify that he saw "something metallic" Robinson told him, according to Robinson's testimony:

"[W]e could not allow him to [testify falsely] because that would be perjury, and as officers of the court we would be suborning perjury if we allowed him to do it; . . . I advised him that if he did do that it would be my duty to advise the Court of what he was doing and that I felt he was committing perjury; also, that I probably would be allowed to attempt to impeach that particular testimony." App. to Pet. for Cert. A–85.

Robinson also indicated he would seek to withdraw from the representation if Whiteside insisted on committing perjury.[2]

Whiteside testified in his own defense at trial and stated that he "knew" that Love had a gun and that he believed Love was reaching for a gun and he had acted swiftly in self-defense. On cross-examination, he admitted that he had not

---

[2] Whiteside's version of the events at this pretrial meeting is considerably more cryptic:

"Q. And as you went over the questions, did the two of you come into conflict with regard to whether or not there was a weapon?

"A. I couldn't—I couldn't say a conflict. But I got the impression at one time that maybe if I didn't go along with—with what was happening, that it was no gun being involved, maybe that he will pull out of my trial." App. to Pet. for Cert. A–70.

actually seen a gun in Love's hand. Robinson presented evidence that Love had been seen with a sawed-off shotgun on other occasions, that the police search of the apartment may have been careless, and that the victim's family had removed everything from the apartment shortly after the crime. Robinson presented this evidence to show a basis for Whiteside's asserted fear that Love had a gun.

The jury returned a verdict of second-degree murder, and Whiteside moved for a new trial, claiming that he had been deprived of a fair trial by Robinson's admonitions not to state that he saw a gun or "something metallic." The trial court held a hearing, heard testimony by Whiteside and Robinson, and denied the motion. The trial court made specific findings that the facts were as related by Robinson.

The Supreme Court of Iowa affirmed respondent's conviction. *State* v. *Whiteside*, 272 N. W. 2d 468 (1978). That court held that the right to have counsel present all appropriate defenses does not extend to using perjury, and that an attorney's duty to a client does not extend to assisting a client in committing perjury. Relying on DR 7–102(A)(4) of the Iowa Code of Professional Responsibility for Lawyers, which expressly prohibits an attorney from using perjured testimony, and Iowa Code § 721.2 (now Iowa Code § 720.3 (1985)), which criminalizes subornation of perjury, the Iowa court concluded that not only were Robinson's actions permissible, but were required. The court commended "both Mr. Robinson and Ms. Paulsen for the high ethical manner in which this matter was handled."

B

Whiteside then petitioned for a writ of habeas corpus in the United States District Court for the Southern District of Iowa. In that petition Whiteside alleged that he had been denied effective assistance of counsel and of his right to present a defense by Robinson's refusal to allow him to testify as he had proposed. The District Court denied the writ. Accepting the state trial court's factual finding that

Whiteside's intended testimony would have been perjurious, it concluded that there could be no grounds for habeas relief since there is no constitutional right to present a perjured defense.

The United States Court of Appeals for the Eighth Circuit reversed and directed that the writ of habeas corpus be granted. *Whiteside* v. *Scurr*, 744 F. 2d 1323 (1984). The Court of Appeals accepted the findings of the trial judge, affirmed by the Iowa Supreme Court, that trial counsel believed with good cause that Whiteside would testify falsely and acknowledged that under *Harris* v. *New York*, 401 U. S. 222 (1971), a criminal defendant's privilege to testify in his own behalf does not include a right to commit perjury. Nevertheless, the court reasoned that an intent to commit perjury, communicated to counsel, does not alter a defendant's right to effective assistance of counsel and that Robinson's admonition to Whiteside that he would inform the court of Whiteside's perjury constituted a threat to violate the attorney's duty to preserve client confidences.[3] According to the Court of Appeals, this threatened violation of client confidences breached the standards of effective representation set down in *Strickland* v. *Washington*, 466 U. S. 668 (1984). The court also concluded that *Strickland*'s prejudice requirement was satisfied by an implication of prejudice from the conflict between Robinson's duty of loyalty to his client and his ethical duties. A petition for rehearing en banc was denied, with Judges Gibson, Ross, Fagg, and Bowman dissenting. *Whiteside* v. *Scurr*, 750 F. 2d 713 (1984). We granted certiorari, 471 U. S. 1014 (1985), and we reverse.

---

[3] The Court of Appeals agreed with the District Court's finding that respondent properly exhausted his claims in state court. Although respondent had pressed his claim before the Supreme Court of Iowa as a denial of his due process right to a fair trial, and not as a denial of his Sixth Amendment right to counsel, the Court of Appeals accepted the District Court's conclusion that the Sixth Amendment claim was exhausted, since further proceedings would be futile.

## II

### A

The right of an accused to testify in his defense is of relatively recent origin. Until the latter part of the preceding century, criminal defendants in this country, as at common law, were considered to be disqualified from giving sworn testimony at their own trial by reason of their interest as a party to the case. See, *e. g., Ferguson* v. *Georgia,* 365 U. S. 570 (1961); R. Morris, Studies in the History of American Law 59–60 (2d ed. 1959). Iowa was among the states that adhered to this rule of disqualification. *State* v. *Laffer,* 38 Iowa 422 (1874).

By the end of the 19th century, however, the disqualification was finally abolished by statute in most states and in the federal courts. Act of Mar. 16, 1878, ch. 37, 20 Stat. 30–31; see Thayer, A Chapter of Legal History in Massachusetts, 9 Harv. L. Rev. 1, 12 (1895). Although this Court has never explicitly held that a criminal defendant has a due process right to testify in his own behalf, cases in several Circuits have so held, and the right has long been assumed. See, *e. g., United States* v. *Curtis,* 742 F. 2d. 1070, 1076 (CA7 1984); *United States* v. *Bifield,* 702 F. 2d 342, 349 (CA2), cert. denied, 461 U. S. 931 (1983). We have also suggested that such a right exists as a corollary to the Fifth Amendment privilege against compelled testimony, see *Harris* v. *New York, supra,* at 225. See also *Ferguson,* 365 U. S., at 598–601 (concurring opinion of Frankfurter, J.); *id.,* at 601–603 (concurring opinion of Clark, J.).

### B

In *Strickland* v. *Washington,* we held that to obtain relief by way of federal habeas corpus on a claim of a deprivation of effective assistance of counsel under the Sixth Amendment, the movant must establish both serious attorney error and prejudice. To show such error, it must be established that the assistance rendered by counsel was constitutionally defi-

cient in that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U. S., at 687. To show prejudice, it must be established that the claimed lapses in counsel's performance rendered the trial unfair so as to "undermine confidence in the outcome" of the trial. *Id.,* at 694.

In *Strickland,* we acknowledged that the Sixth Amendment does not require any particular response by counsel to a problem that may arise. Rather, the Sixth Amendment inquiry is into whether the attorney's conduct was "reasonably effective." To counteract the natural tendency to fault an unsuccessful defense, a court reviewing a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.,* at 689. In giving shape to the perimeters of this range of reasonable professional assistance, *Strickland* mandates that

> "[p]revailing norms of practice as reflected in American Bar Association Standards and the like, . . . are guides to determining what is reasonable, but they are only guides." *Id.,* at 688.

Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel. When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts. In some future case challenging attorney conduct in the course of a state-court trial, we may need to define with greater precision the weight to be given to recognized canons of ethics, the standards established by the state in statutes or professional codes, and the Sixth Amendment,

in defining the proper scope and limits on that conduct. Here we need not face that question, since virtually all of the sources speak with one voice.

## C

We turn next to the question presented: the definition of the range of "reasonable professional" responses to a criminal defendant client who informs counsel that he will perjure himself on the stand. We must determine whether, in this setting, Robinson's conduct fell within the wide range of professional responses to threatened client perjury acceptable under the Sixth Amendment.

In *Strickland*, we recognized counsel's duty of loyalty and his "overarching duty to advocate the defendant's cause." *Ibid.* Plainly, that duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law. This principle has consistently been recognized in most unequivocal terms by expositors of the norms of professional conduct since the first Canons of Professional Ethics were adopted by the American Bar Association in 1908. The 1908 Canon 32 provided:

> "No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. . . . He must . . . observe and advise his client to observe the statute law . . . ."

Of course, this Canon did no more than articulate centuries of accepted standards of conduct. Similarly, Canon 37, adopted in 1928, explicitly acknowledges as an exception to the attorney's duty of confidentiality a client's announced intention to commit a crime:

> "The announced intention of a client to commit a crime is not included within the confidences which [the attorney] is bound to respect."

These principles have been carried through to contemporary codifications[4] of an attorney's professional responsibility. Disciplinary Rule 7–102 of the Model Code of Professional Responsibility (1980), entitled "Representing a Client Within the Bounds of the Law," provides:

> "(A) In his representation of a client, a lawyer shall not:
>
> . . . . .
>
> "(4) Knowingly use perjured testimony or false evidence.
>
> . . . . .
>
> "(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

---

[4] There currently exist two different codifications of uniform standards of professional conduct. The Model Code of Professional Responsibility was originally adopted by the American Bar Association in 1969, and was subsequently adopted (in many cases with modification) by nearly every state. The more recent Model Rules of Professional Conduct were adopted by the American Bar Association in 1983. Since their promulgation by the American Bar Association, the Model Rules have been adopted by 11 States: Arizona, Arkansas, Delaware, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, North Carolina, and Washington. See 1 ABA/BNA Lawyers' Manual on Professional Conduct 334 (1984–1985) (New Jersey); id., at 445 (Arizona); id., at 855 (Montana, Minnesota); id., at 924 (Missouri); id., at 961 (Delaware, Washington); id., at 1026 (North Carolina); id., at 1127 (Arkansas); 2 id., at 14 (1986) (New Hampshire, Nevada). Iowa is one of the States that adopted a form of the Model Code of Professional Responsibility, but has yet to adopt the Model Rules. See Iowa Code of Professional Responsibility for Lawyers (1985).

This provision has been adopted by Iowa, and is binding on all lawyers who appear in its courts. See Iowa Code of Professional Responsibility for Lawyers (1985). The more recent Model Rules of Professional Conduct (1983) similarly admonish attorneys to obey all laws in the course of representing a client:

"*RULE 1.2* Scope of Representation

. . . . .

"(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ."

Both the Model Code of Professional Responsibility and the Model Rules of Professional Conduct also adopt the specific exception from the attorney-client privilege for disclosure of perjury that his client intends to commit or has committed. DR 4–101(C)(3) (intention of client to commit a crime); Rule 3.3 (lawyer has duty to disclose falsity of evidence even if disclosure compromises client confidences). Indeed, both the Model Code and the Model Rules do not merely *authorize* disclosure by counsel of client perjury; they *require* such disclosure. See Rule 3.3(a)(4); DR 7–102(B)(1); *Committee on Professional Ethics and Conduct of Iowa State Bar Assn.* v. *Crary,* 245 N. W. 2d 298 (Iowa 1976).

These standards confirm that the legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence.[5] This special duty of an attorney to prevent and dis-

---

[5] The brief of *amicus* American Bar Association, which supports petitioner, makes this point, referring to the history of codes of professional conduct which it has promulgated. The preamble to the most current version of the ethical standards recognizes the difficult choices that may confront an attorney who is sensitive to his concurrent duties to his client and to the legal system:

close frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice. See 1 W. Burdick, Law of Crime §§ 293, 300, 318–336 (1946).

The offense of perjury was a crime recognized at common law, *id.*, at p. 475, and has been made a felony in most states by statute, including Iowa. Iowa Code § 720.2 (1985). See generally 4 C. Torcia, Wharton's Criminal Law § 631 (14th ed. 1981). An attorney who aids false testimony by questioning a witness when perjurious responses can be anticipated risks prosecution for subornation of perjury under Iowa Code § 720.3 (1985).

It is universally agreed that at a minimum the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct. Model Rules of Professional Conduct, Rule 3.3, Comment; Wolfram, Client Perjury, 50 S. Cal. L. Rev. 809, 846 (1977). A statement directly in point is found in the commentary to the Model Rules of Professional Conduct under the heading "False Evidence":

> "When false evidence is offered by the client, however, a conflict may arise between the lawyer's duty to keep the client's revelations confidential and the duty of candor to the court. Upon ascertaining that material evidence is false, the lawyer *should seek to persuade the client that the evidence should not be offered* or, if it has been offered, that its false character should immediately be disclosed." Model Rules of Professional Conduct, Rule 3.3, Comment (1983) (emphasis added).

---

"Within the framework of these Rules many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules." Preamble, Model Rules of Professional Conduct, p. 10 (1983).

The commentary thus also suggests that an attorney's revelation of his client's perjury to the court is a professionally responsible and acceptable response to the conduct of a client who has actually given perjured testimony. Similarly, the Model Rules and the commentary, as well as the Code of Professional Responsibility adopted in Iowa, expressly permit withdrawal from representation as an appropriate response of an attorney when the client threatens to commit perjury. Model Rules of Professional Conduct, Rule 1.16(a)(1), Rule 1.6, Comment (1983); Code of Professional Responsibility, DR 2–110(B), (C) (1980). Withdrawal of counsel when this situation arises at trial gives rise to many difficult questions including possible mistrial and claims of double jeopardy.[6]

The essence of the brief *amicus* of the American Bar Association reviewing practices long accepted by ethical lawyers

---

[6] In the evolution of the contemporary standards promulgated by the American Bar Association, an early draft reflects a compromise suggesting that when the disclosure of intended perjury is made during the course of trial, when withdrawal of counsel would raise difficult questions of a mistrial holding, counsel had the option to let the defendant take the stand but decline to affirmatively assist the presentation of perjury by traditional direct examination. Instead, counsel would stand mute while the defendant undertook to present the false version in narrative form in his own words unaided by any direct examination. This conduct was thought to be a signal at least to the presiding judge that the attorney considered the testimony to be false and was seeking to disassociate himself from that course. Additionally, counsel would not be permitted to discuss the known false testimony in closing arguments. See ABA Standards for Criminal Justice, Proposed Standard 4–7.7 (2d ed. 1980). Most courts treating the subject rejected this approach and insisted on a more rigorous standard, see, *e. g.,* *United States* v. *Curtis,* 742 F. 2d 1070 (CA7 1984); *McKissick* v. *United States,* 379 F. 2d 754 (CA5 1967); *Dodd* v. *Florida Bar,* 118 So. 2d 17, 19 (Fla. 1960). The Eighth Circuit in this case and the Ninth Circuit have expressed approval of the "free narrative" standards. *Whiteside* v. *Scurr,* 744 F. 2d 1323, 1331 (CA8 1984); *Lowery* v. *Cardwell,* 575 F. 2d 727 (CA9 1978).

The Rule finally promulgated in the current Model Rules of Professional Conduct rejects any participation or passive role whatever by counsel in allowing perjury to be presented without challenge.

is that under no circumstance may a lawyer either advocate or passively tolerate a client's giving false testimony. This, of course, is consistent with the governance of trial conduct in what we have long called "a search for truth." The suggestion sometimes made that "a lawyer must believe his client, not judge him" in no sense means a lawyer can honorably be a party to or in any way give aid to presenting known perjury.

## D

Considering Robinson's representation of respondent in light of these accepted norms of professional conduct, we discern no failure to adhere to reasonable professional standards that would in any sense make out a deprivation of the Sixth Amendment right to counsel. Whether Robinson's conduct is seen as a successful attempt to dissuade his client from committing the crime of perjury, or whether seen as a "threat" to withdraw from representation and disclose the illegal scheme, Robinson's representation of Whiteside falls well within accepted standards of professional conduct and the range of reasonable professional conduct acceptable under *Strickland*.

The Court of Appeals assumed for the purpose of the decision that Whiteside would have given false testimony had counsel not intervened; its opinion denying a rehearing en banc states:

"[W]e presume that appellant would have testified falsely.

.   .   .   .   .

". . . Counsel's actions prevented [Whiteside] from testifying falsely. We hold that counsel's action deprived appellant of due process and effective assistance of counsel.

.   .   .   .   .

"Counsel's actions also impermissibly compromised appellant's right to testify in his own defense by conditioning continued representation by counsel and confidential-

ity upon appellant's restricted testimony." 750 F. 2d., at 714–715.

While purporting to follow Iowa's highest court "on all questions of state law," 744 F. 2d., at 1330, the Court of Appeals reached its conclusions on the basis of federal constitutional due process and right to counsel.

The Court of Appeals' holding that Robinson's "action deprived [Whiteside] of due process and effective assistance of counsel" is not supported by the record since Robinson's action, at most, deprived Whiteside of his contemplated perjury. Nothing counsel did in any way undermined Whiteside's claim that he believed the victim was reaching for a gun. Similarly, the record gives no support for holding that Robinson's action "also impermissibly compromised [Whiteside's] right to testify in his own defense by conditioning continued representation . . . and confidentiality upon [Whiteside's] *restricted* testimony." The record in fact shows the contrary: (a) that Whiteside did testify, and (b) he was "restricted" or restrained only from testifying falsely and was aided by Robinson in developing the basis for the fear that Love was reaching for a gun. Robinson divulged no client communications until he was compelled to do so in response to Whiteside's post-trial challenge to the quality of his performance. We see this as a case in which the attorney successfully dissuaded the client from committing the crime of perjury.

Paradoxically, even while accepting the conclusion of the Iowa trial court that Whiteside's proposed testimony would have been a criminal act, the Court of Appeals held that Robinson's efforts to persuade Whiteside not to commit that crime were improper, *first*, as forcing an impermissible choice between the right to counsel and the right to testify; and, *second,* as compromising client confidences because of Robinson's threat to disclose the contemplated perjury.[7]

---

[7] The Court of Appeals also determined that Robinson's efforts to persuade Whiteside to testify truthfully constituted an impermissible threat to testify against his own client. We find no support for a threat to testify

Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely*. In *Harris* v. *New York*, we assumed the right of an accused to testify "in his own defense, or to refuse to do so" and went on to hold:

> "[T]hat privilege cannot be construed to include the right to commit perjury. See *United States* v. *Knox*, 396 U. S. 77 (1969); cf. *Dennis* v. *United States*, 384 U. S. 855 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully . . . ." 401 U. S., at 225.

In *Harris* we held the defendant could be impeached by prior contrary statements which had been ruled inadmissible under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). *Harris* and other cases make it crystal clear that there is no right whatever—constitutional or otherwise—for a defendant to use false evidence. See also *United States* v. *Havens*, 446 U. S. 620, 626–627 (1980).

The paucity of authority on the subject of any such "right" may be explained by the fact that such a notion has never been responsibly advanced; the right to counsel includes no right to have a lawyer who will cooperate with planned perjury. A lawyer who would so cooperate would be at risk of prosecution for suborning perjury, and disciplinary proceedings, including suspension or disbarment.

Robinson's admonitions to his client can in no sense be said to have forced respondent into an *impermissible* choice between his right to counsel and his right to testify as he proposed for there was no *permissible* choice to testify falsely. For defense counsel to take steps to persuade a criminal defendant to testify truthfully, or to withdraw, deprives the defendant of neither his right to counsel nor the right to

---

against Whiteside while he was acting as counsel. The record reflects testimony by Robinson that he had admonished Whiteside that if he withdrew he "probably would be allowed to attempt to impeach that particular testimony," if Whiteside testified falsely. The trial court accepted this version of the conversation as true.

testify truthfully. In *United States* v. *Havens, supra,* we made clear that "when defendants testify, they must testify truthfully or suffer the consequences." *Id.,* at 626. When an accused proposes to resort to perjury or to produce false evidence, one consequence is the risk of withdrawal of counsel.

On this record, the accused enjoyed continued representation within the bounds of reasonable professional conduct and did in fact exercise his right to testify; at most he was denied the right to have the assistance of counsel in the presentation of false testimony. Similarly, we can discern no breach of professional duty in Robinson's admonition to respondent that he would disclose respondent's perjury to the court. The crime of perjury in this setting is indistinguishable in substance from the crime of threatening or tampering with a witness or a juror. A defendant who informed his counsel that he was arranging to bribe or threaten witnesses or members of the jury would have no "right" to insist on counsel's assistance or silence. Counsel would not be limited to advising against that conduct. An attorney's duty of confidentiality, which totally covers the client's admission of guilt, does not extend to a client's announced plans to engage in future criminal conduct. See *Clark* v. *United States,* 289 U. S. 1, 15 (1933). In short, the responsibility of an ethical lawyer, as an officer of the court and a key component of a system of justice, dedicated to a search for truth, is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury. No system of justice worthy of the name can tolerate a lesser standard.

The rule adopted by the Court of Appeals, which seemingly would require an attorney to remain silent while his client committed perjury, is wholly incompatible with the established standards of ethical conduct and the laws of Iowa and contrary to professional standards promulgated by that State. The position advocated by petitioner, on the con-

trary, is wholly consistent with the Iowa standards of professional conduct and law, with the overwhelming majority of courts,[8] and with codes of professional ethics. Since there has been no breach of any recognized professional duty, it follows that there can be no deprivation of the right to assistance of counsel under the *Strickland* standard.

### E

We hold that, as a matter of law, counsel's conduct complained of here cannot establish the prejudice required for relief under the second strand of the *Strickland* inquiry. Although a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U. S., at 694. According to *Strickland*, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* The *Strickland* Court noted that the "benchmark" of an ineffective-assistance claim is the fairness of the adversary proceeding, and that in judging prejudice and the likelihood of a different outcome, "[a] defendant has no entitlement to the luck of a lawless decisionmaker." *Id.*, at 695.

Whether he was persuaded or compelled to desist from perjury, Whiteside has no valid claim that confidence in the result of his trial has been diminished by his desisting from the contemplated perjury. Even if we were to assume that

---

[8] See *United States* v. *Curtis*, 742 F. 2d 1070 (CA7 1984); *Committee on Professional Ethics* v. *Crary*, 245 N. W. 2d 298 (Iowa 1976); *State* v. *Robinson*, 290 N. C. 56, 224 S. E. 2d 174 (1976); *Thornton* v. *United States*, 357 A. 2d 429 (D. C. 1976); *State* v. *Henderson*, 205 Kan. 231, 468 P. 2d 136 (1970); *McKissick* v. *United States*, 379 F. 2d 754 (CA5 1967); *In re King*, 7 Utah 2d 258, 322 P. 2d 1095 (1958); *In re Carroll*, 244 S. W. 2d 474 (Ky. 1951); *Hinds* v. *State Bar*, 19 Cal. 2d 87, 119 P. 2d 134 (1941). Contra, *Whiteside* v. *Scurr*, 744 F. 2d 1323 (CA8 1984) (case below); *Lowery* v. *Cardwell*, 575 F. 2d 727 (CA9 1978).

the jury might have believed his perjury, it does not follow that Whiteside was prejudiced.

In his attempt to evade the prejudice requirement of *Strickland,* Whiteside relies on cases involving conflicting loyalties of counsel. In *Cuyler* v. *Sullivan,* 446 U. S. 335 (1980), we held that a defendant could obtain relief without pointing to a specific prejudicial default on the part of his counsel, provided it is established that the attorney was "actively represent[ing] conflicting interests." *Id.,* at 350.

Here, there was indeed a "conflict," but of a quite different kind; it was one imposed on the attorney by the client's proposal to commit the crime of fabricating testimony without which, as he put it, "I'm dead." This is not remotely the kind of conflict of interests dealt with in *Cuyler* v. *Sullivan.* Even in that case we did not suggest that all multiple representations necessarily resulted in an active conflict rendering the representation constitutionally infirm. If a "conflict" between a client's proposal and counsel's ethical obligation gives rise to a presumption that counsel's assistance was prejudicially ineffective, every guilty criminal's conviction would be suspect if the defendant had sought to obtain an acquittal by illegal means. Can anyone doubt what practices and problems would be spawned by such a rule and what volumes of litigation it would generate?

Whiteside's attorney treated Whiteside's proposed perjury in accord with professional standards, and since Whiteside's truthful testimony could not have prejudiced the result of his trial, the Court of Appeals was in error to direct the issuance of a writ of habeas corpus and must be reversed.

*Reversed.*

JUSTICE BRENNAN, concurring in the judgment.

This Court has no constitutional authority to establish rules of ethical conduct for lawyers practicing in the state courts. Nor does the Court enjoy any statutory grant of jurisdiction over legal ethics.

Accordingly, it is not surprising that the Court emphasizes that it "must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts." *Ante*, at 165. I read this as saying in another way that the Court *cannot* tell the States or the lawyers in the States how to behave in their courts, unless and until federal rights are violated.

Unfortunately, the Court seems unable to resist the temptation of sharing with the legal community its vision of ethical conduct. But let there be no mistake: the Court's essay regarding what constitutes the correct response to a criminal client's suggestion that he will perjure himself is pure discourse without force of law. As JUSTICE BLACKMUN observes, *that* issue is a thorny one, *post*, at 177–178, but it is not an issue presented by this case. Lawyers, judges, bar associations, students, and others should understand that the problem has not now been "decided."

I join JUSTICE BLACKMUN's concurrence because I agree that respondent has failed to prove the kind of prejudice necessary to make out a claim under *Strickland* v. *Washington*, 466 U. S. 668 (1984).

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, concurring in the judgment.

How a defense attorney ought to act when faced with a client who intends to commit perjury at trial has long been a controversial issue.[1] But I do not believe that a federal

---

[1] See, *e. g.*, Callan & David, Professional Responsibility and the Duty of Confidentiality: Disclosure of Client Misconduct in an Adversary System, 29 Rutgers L. Rev. 332 (1976); Rieger, Client Perjury: A Proposed Resolution of the Constitutional and Ethical Issues, 70 Minn. L. Rev. 121 (1985); compare, *e. g.*, Freedman, Professional Responsibility of the Criminal De-

habeas corpus case challenging a state criminal conviction is an appropriate vehicle for attempting to resolve this thorny problem. When a defendant argues that he was denied effective assistance of counsel because his lawyer dissuaded him from committing perjury, the only question properly presented to this Court is whether the lawyer's actions deprived the defendant of the fair trial which the Sixth Amendment is meant to guarantee. Since I believe that the respondent in this case suffered no injury justifying federal habeas relief, I concur in the Court's judgment.

## I

On February 7, 1977, Emmanual Charles Whiteside stabbed Calvin Love to death. At trial, Whiteside claimed self-defense. On direct examination, he testified that Love's bedroom, where the stabbing had occurred, was "[v]ery much dark," App. 48, and that he had stabbed Love during an argument because he believed that Love was about to attack him with a weapon:

"Q. Did you think that Calvin had a gun?
"A. Most definitely I thought that.
"Q. Why did you think that?
"A. Because of Calvin's reputation, his brother's reputation, because of the prior conversation that Calvin and I had, I didn't have no other choice but to think he had a gun. And when he told his girl friend to give him his piece, I couldn't retreat." *Id.*, at 50.

Whiteside's testimony was consistent with that of other witnesses who testified that the room was dark, and that Love

fense Lawyer: The Three Hardest Questions, 64 Mich. L. Rev. 1469 (1966), and ABA Standards for Criminal Justice, Proposed Standard 4–7.7 (2d ed. 1980) (approved by the Standing Committee on Association Standards for Criminal Justice, but not yet submitted to the House of Delegates), with Noonan, The Purposes of Advocacy and the Limits of Confidentiality, 64 Mich. L. Rev. 1485 (1966), and ABA Model Rules of Professional Conduct, Rule 3.3 and comment, at 66–67 (1983).

had asked his girlfriend to get his "piece" (which they all believed referred to a weapon). See, *e. g., id.*, at 17–18, 20, 36–37, and 42–45. No gun, however, was ever found.

Whiteside, who had been charged with first-degree murder, was convicted of second-degree murder, and sentenced to 40 years' imprisonment. He moved for a new trial, contending that his court-appointed attorneys, Gary Robinson and Donna Paulsen, had improperly coerced his testimony. Whiteside now claimed that he had seen a gun, but had been prevented from testifying to this fact.

At an evidentiary hearing on this motion, Whiteside testified that he had told Robinson at their first meeting that he had seen a weapon in Love's hand. Some weeks later, Robinson informed Whiteside that the weapon could not be found and, according to Whiteside, told him to say only that he thought he had seen a gun, rather than that he in fact had seen one. Whiteside "got the impression at one time that maybe if I didn't go along with—with what was happening, that it was no gun being involved, maybe that he will pull out of my trial." App. to Pet. for Cert. A70.

Robinson's testimony contradicted Whiteside's. According to Robinson, Whiteside did not initially claim to have seen a gun, but rather claimed only that he was convinced Love had had one. Roughly a week before the trial, however, in the course of reviewing Whiteside's testimony, Whiteside "made reference to seeing something 'metallic' . . . . I don't think he ever did say a gun." *Id.*, at A85:

> "And at the end Donna asked him about that, because that was the first time it had ever been mentioned either to her or to myself. His response to that was, 'in Howard Cook's case there was a gun. If I don't say I saw a gun, I'm dead.' I explained to him at that time that it was not necessary that the gun be physically present for self-defense, one; two, that to say that would be perjury on his part because he had never at any time indicated that there was a gun . . . ; three, that we could not allow

him to do that . . . ; four, I advised him that if he did do that it would be my duty to advise the Court of what he was doing . . . ; also, that I probably would be allowed to attempt to impeach that particular testimony. I told him that there was no need for him to lie about what had happened, that he had a good and valid defense on the facts as he had related them to us, and we felt we could present a good self-defense case on the facts he had stated to us." *Ibid.*

Robinson acknowledged that Whiteside's claim of self-defense would have been stronger had the gun been found, but explained that at trial "we tried to create a gun," through testimony from people who had seen Love carrying a gun on other occasions, through a stipulation that Love had been convicted of possession of a weapon, and through suggestions made during cross-examination of the State's witnesses that the initial police search had been too cursory to discover the weapon and that Love's girlfriend had removed it from the apartment prior to a second, more thorough, search. *Id.*, at A87–A88.

The trial court rejected Whiteside's motion for a new trial, "find[ing] the facts to be as testified to by Ms. Paulsen and Mr. Robinson." App. 57. The Iowa Supreme Court affirmed. *State* v. *Whiteside*, 272 N. W. 2d 468 (1978).

Whiteside then sought federal habeas relief in the United States District Court for the Southern District of Iowa. The parties agreed to rest on the record made in the state-court proceedings. Chief Judge Stuart held that the trial judge's factual finding that Whiteside would have committed perjury had he testified at trial actually to having seen a gun was fairly supported by the record and thus entitled to a presumption of correctness. See 28 U. S. C. § 2254(d). Since Whiteside had no constitutional right to perjure himself, he had been denied neither a fair trial nor effective assistance of counsel. App. to Pet. for Cert. A41.

The Court of Appeals for the Eighth Circuit reversed. *Whiteside* v. *Scurr*, 744 F. 2d 1323 (1984). The court recognized that the issue before it was not whether Robinson had behaved ethically,[2] but rather whether Whiteside had been deprived of effective assistance of counsel. *Id.*, at 1330. In the Court of Appeals' view, Robinson had breached the obligations of confidentiality and zealous advocacy imposed on defense counsel by the Sixth Amendment. In addition, the Court of Appeals concluded that Robinson's actions impermissibly compromised Whiteside's constitutional right to testify in his own behalf by conditioning continued representation and confidentiality on Whiteside's limiting his testimony.

The court recognized that, under *Strickland* v. *Washington*, 466 U. S. 668 (1984), a defendant must normally demonstrate both that his attorney's behavior was professionally unreasonable and that he was prejudiced by his attorney's unprofessional behavior. But it noted that *Strickland* v. *Washington* had recognized a "limited" presumption of prejudice when counsel is burdened by an actual conflict of interest that adversely affects his performance, see *id.*, at 692, quoting *Cuyler* v. *Sullivan*, 446 U. S. 335, 348, 350 (1980). Here, Whiteside had shown that Robinson's obligations under the Iowa Code of Professional Responsibility conflicted with his client's wishes, and his threat to testify against Whiteside had adversely affected Whiteside by "undermin[ing] the fun-

---

[2] The court stated:

"That question is governed solely by the Iowa Code of Professional Responsibility, as it was in effect at the time of the trial in this case, and as it has been authoritatively interpreted by the Supreme Court of Iowa. The Supreme Court of Iowa is the last word on all questions of state law, and the Code of Professional Responsibility is a species of state law." 744 F. 2d, at 1330.

Thus, the court declined to address the question whether Robinson's actions were either compelled or condoned by Iowa law.

damental trust between lawyer and client" necessary for effective representation. 744 F. 2d, at 1330.

Petitioner's motion for rehearing en banc was denied by a vote of 5 to 4. *Whiteside* v. *Scurr*, 750 F. 2d 713 (CA8 1984). In dissent, Judge John R. Gibson, joined by Judges Ross, Fagg, and Bowman, argued that Whiteside had failed to show cognizable prejudice. *Cuyler* v. *Sullivan* was inapposite, both because finding a conflict of interest required making the untenable assumption that Whiteside possessed the right to testify falsely and because Robinson's threat had had no adverse effect on the trial since Whiteside testified fully in his defense. Moreover, the result of the proceeding should not have been different had Whiteside been permitted to testify as he wished.

A separate dissent by Judge Fagg, joined by Judges Ross, John R. Gibson, and Bowman, addressed the performance prong of *Strickland*. Robinson's admonition to Whiteside to testify truthfully simply could not be viewed as creating a conflict of interest; Robinson presented a full and zealous defense at trial; and, although Robinson's warning to Whiteside may have been "strident," 750 F. 2d, at 718, he had communicated with his client in a manner the client understood.

## II

### A

The District Court found that the trial judge's statement that "I find the facts to be as testified to by Ms. Paulsen and Mr. Robinson" was a factual finding that Whiteside "would have perjured himself if he had testified at trial that he actually saw a gun in his victim's hand." App. to Pet. for Cert. A42. This factual finding by the state court is entitled to a presumption of correctness under 28 U. S. C. §2254(d), which Whiteside has not overcome.

Respondent has never attempted to rebut the presumption by claiming that the factfinding procedure employed by Iowa in considering new trial motions in any sense deprived him of

a full and fair hearing or failed to provide a sufficient basis for denying his motion.[3]  Although respondent's argument to this Court in large part assumes that the precluded testimony would have been false, see Brief for Respondent 10–11, he contends, first, that the record does not fairly support the conclusion that he intended to perjure himself because he claimed in his first written statement that Love had been pulling a pistol from under a pillow at the time of the stabbing, see App. 55, and, second, that whether Robinson had sufficient knowledge to conclude he was going to commit perjury was a mixed question of law and fact to which the presumption of correctness does not apply.

Neither contention overcomes the presumption of correctness due the state court's finding.  First, the trial judge's implicit decision not to credit the written statement is fairly supported by Robinson's testimony that the written statement had not been prepared by Whiteside alone and that, from the time of their initial meeting until the week before trial, Whiteside never again claimed to have seen a gun.  See App. to Pet. for Cert. A78–A79.  Second, the finding properly accorded a presumption of correctness by the courts below was that Whiteside's "proposed testimony would [have

---

[3] Whiteside's motion for a new trial rested on his recantation of his testimony at trial.  As a matter of Iowa law, when a trial judge is faced with a motion for a new trial based on a witness' recantation of his trial testimony, the judge must decide whether the recantation is believable:

"The trial court is not required to believe the recantation, but must make its decision on the basis of the whole trial and the matters presented on the hearing on the motion.  Premised thereon, if it believes the [post conviction] statements . . . are false, and is not reasonably well satisfied that the testimony given by the witness on the trial was false, it should deny the motion, and it is not at liberty to shift upon the shoulders of another jury the responsibility to seek out the truth of that matter." *State* v. *Compiano*, 261 Iowa 509, 517, 154 N. W. 2d 845, 849 (1967).

See also, *e. g.*, *State* v. *Taylor*, 287 N. W. 2d 576, 578 (Iowa 1980); *State* v. *McGhee*, 280 N. W. 2d 436, 442 (Iowa 1979), cert. denied, 444 U. S. 1039 (1980); cf. *United States* v. *Johnson*, 327 U. S. 106, 110–111 (1946).

been] deliberately untruthful." *State* v. *Whiteside*, 272 N. W. 2d, at 471. The lower courts did not purport to presume the correctness of the Iowa Supreme Court's holding concerning the mixed question respondent identifies — whether Robinson's response to Whiteside's proposed testimony deprived Whiteside of effective representation.

## B

The Court approaches this case as if the performance-and-prejudice standard requires us in every case to determine "the perimeters of [the] range of reasonable professional assistance," *ante*, at 165, but *Strickland* v. *Washington* explicitly contemplates a different course:

> "Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U. S., at 697.

See also *Hill* v. *Lockhart*, 474 U. S. 52, 60 (1985). In this case, respondent has failed to show any legally cognizable prejudice. Nor, as is discussed below, is this a case in which prejudice should be presumed.

The touchstone of a claim of prejudice is an allegation that counsel's behavior did something "to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland* v. *Washington*, 466 U. S., at 687. The only effect Robinson's threat had on Whiteside's trial is that Whiteside did not

testify, falsely, that he saw a gun in Love's hand.[4]   Thus, this Court must ask whether its confidence in the outcome of Whiteside's trial is in any way undermined by the knowledge that he refrained from presenting false testimony.   See *id.*, at 694.

This Court long ago noted: "All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth.   Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial."   *In re Michael*, 326 U. S. 224, 227 (1945).   When the Court has been faced with a claim by a defendant concerning prosecutorial use of such evidence, it has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury" (footnote omitted). *United States* v. *Agurs*, 427 U. S. 97, 103 (1976).   See also, *e. g.*, *Napue* v. *Illinois*, 360 U. S. 264, 269 (1959); *Pyle* v. *Kansas*, 317 U. S. 213, 216 (1942); *Mooney* v. *Holohan*, 294 U. S. 103, 112 (1935).   Similarly, the Court has viewed a defendant's use of such testimony as so antithetical to our system of justice that it has permitted the prosecution to introduce otherwise inadmissible evidence to combat it.   See, *e. g.*, *United States* v. *Havens*, 446 U. S. 620, 626–627 (1980); *Oregon* v. *Hass*, 420 U. S. 714, 720–723 (1975); *Harris* v. *New York*, 401 U. S. 222, 225–226 (1971); *Walder* v. *United States*, 347 U. S. 62, 65 (1954).   The proposition that presenting false evidence could contribute to (or that withholding such evidence could detract from) the reliability of a criminal trial is simply untenable.

---

[4] This is not to say that a lawyer's threat to reveal his client's confidences may never have other effects on a defendant's trial.   Cf. *United States ex rel. Wilcox* v. *Johnson*, 555 F. 2d 115 (CA3 1977) (finding a violation of Sixth Amendment when an attorney's threat to reveal client's purported perjury caused defendant not to take the stand at all).

It is no doubt true that juries sometimes have acquitted defendants who should have been convicted, and sometimes have based their decisions to acquit on the testimony of defendants who lied on the witness stand. It is also true that the Double Jeopardy Clause bars the reprosecution of such acquitted defendants, although on occasion they can be prosecuted for perjury. See, *e. g., United States* v. *Williams*, 341 U. S. 58, 63–65 (1951). But the privilege every criminal defendant has to testify in his own defense "cannot be construed to include the right to commit perjury." *Harris* v. *New York*, 401 U. S., at 225.[5] To the extent that Whiteside's claim rests on the assertion that he would have been acquitted had he been able to testify falsely, Whiteside claims a right the law simply does not recognize. "A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed." *Strickland* v. *Washington*, 466 U. S., at 695. Since Whiteside was deprived of neither a fair trial nor any of the specific constitutional

_____

[5] Whiteside was not deprived of the right to testify in his own defense, since no suggestion has been made that Whiteside's testimony was restricted in any way beyond the fact that he did not claim, falsely, to have seen a gun in Love's hand.

I must confess that I am somewhat puzzled by the Court's implicit suggestion that whether a defendant has a constitutional right to testify in his own defense remains an open question. *Ante*, at 164. It is true that in *Ferguson* v. *Georgia*, 365 U. S. 570 (1961), the Court expressly declined to address the question of a defendant's constitutional right to testify, but that was because the case did not properly raise the issue. *Id.*, at 572, n. 1. Since then, the Court repeatedly has referred to the existence of such a right. See, *e. g., Jones* v. *Barnes*, 463 U. S. 745, 751 (1983) (the defendant has the "ultimate authority to make certain fundamental decisions regarding the case, [such as] . . . whether to . . . testify in his or her own behalf"); *Brooks* v. *Tennessee*, 406 U. S. 605, 612 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right"); *Harris* v. *New York*. I cannot imagine that if we were presented with a state statute that prohibited a defendant from testifying at his own trial, we would not rule that it violates both the Sixth and Fourteenth Amendments, as well as, perhaps, the Fifth.

rights designed to guarantee a fair trial, he has suffered no prejudice.

The Court of Appeals erred in concluding that prejudice should have been presumed. *Strickland* v. *Washington* found such a presumption appropriate in a case where an attorney labored under "'an actual conflict of interest [that] adversely affected his . . . performance,'" *id.*, at 692, quoting *Cuyler* v. *Sullivan*, 446 U. S., at 348. In this case, however, no actual conflict existed. I have already discussed why Whiteside had no right to Robinson's help in presenting perjured testimony. Moreover, Whiteside has identified no right to insist that Robinson keep confidential a plan to commit perjury. See *Committee on Professional Ethics and Conduct of Iowa State Bar Assn.* v. *Crary*, 245 N. W. 2d 298, 306 (Iowa 1976). The prior cases where this Court has reversed convictions involved conflicts that infringed a defendant's legitimate interest in vigorous protection of his constitutional rights. See, *e. g.*, *Wood* v. *Georgia*, 450 U. S. 261, 268–271 (1981) (defense attorney paid by defendants' employer might have pursued employer's interest in litigating a test case rather than obtaining leniency for his clients by cooperating with prosecution); *Glasser* v. *United States*, 315 U. S. 60, 72–75 (1942) (defense attorney who simultaneously represented two defendants failed to object to certain potentially inadmissible evidence or to cross-examine a prosecution witness in an apparent attempt to minimize one codefendant's guilt). Here, Whiteside had no legitimate interest that conflicted with Robinson's obligations not to suborn perjury and to adhere to the Iowa Code of Professional Responsibility.

In addition, the lawyer's interest in not presenting perjured testimony was entirely consistent with Whiteside's best interest. If Whiteside had lied on the stand, he would have risked a future perjury prosecution. Moreover, his testimony would have been contradicted by the testimony of other eyewitnesses and by the fact that no gun was ever found. In light of that impeachment, the jury might have

concluded that Whiteside lied as well about his lack of pre-meditation and thus might have convicted him of first-degree murder. And if the judge believed that Whiteside had lied, he could have taken Whiteside's perjury into account in setting the sentence. *United States* v. *Grayson*, 438 U. S. 41, 52–54 (1978).[6] In the face of these dangers, an attorney could reasonably conclude that dissuading his client from committing perjury was in the client's best interest and comported with standards of professional responsibility.[7] In short, Whiteside failed to show the kind of conflict that poses a danger to the values of zealous and loyal representation embodied in the Sixth Amendment. A presumption of prejudice is therefore unwarranted.

## C

In light of respondent's failure to show any cognizable prejudice, I see no need to "grade counsel's performance." *Strickland* v. *Washington*, 466 U. S., at 697. The only federal issue in this case is whether Robinson's behavior deprived Whiteside of the effective assistance of counsel; it is not whether Robinson's behavior conformed to any particular code of legal ethics.

Whether an attorney's response to what he sees as a client's plan to commit perjury violates a defendant's Sixth Amendment rights may depend on many factors: how certain the attorney is that the proposed testimony is false, the stage

---

[6] In fact, the State apparently asked the trial court to impose a sentence of 75 years, see Tr. 4 (Aug. 26, 1977), but the judge sentenced Whiteside to 40 years' imprisonment instead.

[7] This is not to say that an attorney's ethical obligations will never conflict with a defendant's right to effective assistance. For example, an attorney who has previously represented one of the State's witnesses has a continuing obligation to that former client not to reveal confidential information received during the course of the prior representation. That continuing duty could conflict with his obligation to his present client, the defendant, to cross-examine the State's witnesses zealously. See Lowenthal, Successive Representation by Criminal Lawyers, 93 Yale L. J. 1 (1983).

of the proceedings at which the attorney discovers the plan, or the ways in which the attorney may be able to dissuade his client, to name just three. The complex interaction of factors, which is likely to vary from case to case, makes inappropriate a blanket rule that defense attorneys must reveal, or threaten to reveal, a client's anticipated perjury to the court. Except in the rarest of cases, attorneys who adopt "the role of the judge or jury to determine the facts," *United States ex rel. Wilcox* v. *Johnson*, 555 F. 2d 115, 122 (CA3 1977), pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment.[8]

I therefore am troubled by the Court's implicit adoption of a set of standards of professional responsibility for attorneys in state criminal proceedings. See *ante*, at 168–171. The States, of course, do have a compelling interest in the integrity of their criminal trials that can justify regulating the length to which an attorney may go in seeking his client's acquittal. But the American Bar Association's implicit suggestion in its brief *amicus curiae* that the Court find that the Association's Model Rules of Professional Conduct should govern an attorney's responsibilities is addressed to the wrong audience. It is for the States to decide how attorneys should conduct themselves in state criminal proceedings, and

---

[8] A comparison of this case with *Wilcox* is illustrative. Here, Robinson testified in detail to the factors that led him to conclude that respondent's assertion he had seen a gun was false. See, *e. g.*, Tr. 38–39, 43, 59 (July 29, 1977). The Iowa Supreme Court found "good cause" and "strong support" for Robinson's conclusion. *State* v. *Whiteside*, 272 N. W. 2d 468, 471 (1978). Moreover, Robinson gave credence to those parts of Whiteside's account which, although he found them implausible and unsubstantiated, were not clearly false. See Tr. 52–53 (July 29, 1977). By contrast, in *Wilcox*, where defense counsel actually informed the judge that she believed her client intended to lie and where her threat to withdraw in the middle of the trial led the defendant not to take the stand at all, the Court of Appeals found "no evidence on the record of this case indicating that Mr. Wilcox intended to perjure himself," and characterized counsel's beliefs as "private conjectures about the guilt or innocence of [her] client." 555 F. 2d, at 122.

this Court's responsibility extends only to ensuring that the restrictions a State enacts do not infringe a defendant's federal constitutional rights. Thus, I would follow the suggestion made in the joint brief *amici curiae* filed by 37 States at the certiorari stage that we allow the States to maintain their "differing approaches" to a complex ethical question. Brief for State of Indiana et al. as *Amici Curiae* 5. The signal merit of asking first whether a defendant has shown any adverse prejudicial effect before inquiring into his attorney's performance is that it avoids unnecessary federal interference in a State's regulation of its bar. Because I conclude that the respondent in this case failed to show such an effect, I join the Court's judgment that he is not entitled to federal habeas relief.

JUSTICE STEVENS, concurring in the judgment.

Justice Holmes taught us that a word is but the skin of a living thought. A "fact" may also have a life of its own. From the perspective of an appellate judge, after a case has been tried and the evidence has been sifted by another judge, a particular fact may be as clear and certain as a piece of crystal or a small diamond. A trial lawyer, however, must often deal with mixtures of sand and clay. Even a pebble that seems clear enough at first glance may take on a different hue in a handful of gravel.

As we view this case, it appears perfectly clear that respondent intended to commit perjury, that his lawyer knew it, and that the lawyer had a duty—both to the court and to his client, for perjured testimony can ruin an otherwise meritorious case—to take extreme measures to prevent the perjury from occurring. The lawyer was successful and, from our unanimous and remote perspective, it is now pellucidly clear that the client suffered no "legally cognizable prejudice."

Nevertheless, beneath the surface of this case there are areas of uncertainty that cannot be resolved today. A lawyer's certainty that a change in his client's recollection is a

harbinger of intended perjury—as well as judicial review of such apparent certainty—should be tempered by the realization that, after reflection, the most honest witness may recall (or sincerely believe he recalls) details that he previously overlooked. Similarly, the post-trial review of a lawyer's pretrial threat to expose perjury that had not yet been committed—and, indeed, may have been prevented by the threat—is by no means the same as review of the way in which such a threat may actually have been carried out. Thus, one can be convinced—as I am—that this lawyer's actions were a proper way to provide his client with effective representation without confronting the much more difficult questions of what a lawyer must, should, or may do after his client has given testimony that the lawyer does not believe. The answer to such questions may well be colored by the particular circumstances attending the actual event and its aftermath.

Because JUSTICE BLACKMUN has preserved such questions for another day, and because I do not understand him to imply any adverse criticism of this lawyer's representation of his client, I join his opinion concurring in the judgment.