PER CURIAM.
liThe state charged defendant with possession of a firearm by a convicted felon in violation of La.R.S. 14:95.1. On October 19, 2005, a Terrebonne Parish jury rendered a verdict of guilty as charged. Thereafter, defendant filed a motion for a new trial claiming, inter alia, that his trial attorney had rendered ineffective assistance of counsel in failing to call two witnesses, Marcus Stoves, a lifetime friend of defendant, and Chandra Lewis, defendant’s girlfriend of several years, who could have provided the jury with a reasonable hypothesis of innocence negating the state’s *114 case that defendant had constructive possession of the firearm at the time of his arrest. On July 12, 2006, the trial court held a hearing on the motion at which Stoves, Lewis, defendant, and his trial attorney, Tedrick Knightshead, all testified. The court took the motion under advisement and on July 14, 2006, denied defendant a new trial on grounds that “there’s been no injustice in this ease.” Thereafter, the court sentenced defendant to 10 years 12imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The court also imposed a $1,000 fine as well as court costs.
On appeal, a divided panel of the First Circuit reversed defendant’s conviction and sentence. State v. Woodard, 07-0402 (La.App. 1st Cir.2/20/08)(unpub’d)(Whip-ple, J., dissenting). A majority on the panel concluded that the trial court erred in denying the motion for a new trial because “[t]he failure to present testimony of witnesses that would have changed the outcome of the proceeding constitutes deficient performance and cannot be considered strategic.” Id., 07-0402 at 16. We granted the state’s application to reverse that decision because we agree with Judge Whipple’s dissent that defendant’s trial attorney made a sound strategic decision not to call the witnesses.
The evidence presented at trial was straightforward and undisputed. On March 31, 2005, Terrebonne Parish Narcotics Task Force officers responded to a call from the manager of Chateau Creole Apartments in Houma about suspected drug activity in their parking lot. The information came from the maintenance supervisor for the complex who had been walking around the parking lot, spotted a Honda Accord which he deemed out of place, and smelled marijuana coming from the vehicle. He also observed a black male exit the vehicle and enter apartment A24, which was rented to Chandra Lewis and Melanie Williams. When the task force officers arrived, they spoke to the maintenance supervisor and ran the plate number on the vehicle, determining that it was registered to the defendant.
After a K-9 alerted to the presence of narcotics near the driver’s side door of the Honda, Agent Wes Hanlon approached apartment A24 and knocked on the door several times. Defendant finally came to the door, opening it only partially. |3In short order, Agent Hanlon placed his foot between the door and the frame to keep the door open after he smelled marijuana wafting from the interior, gained entrance to the apartment, and prevailed on defendant, who initially identified himself as his brother, to give his true name and to acknowledge ownership of the Honda parked outside.
As the agent continued to question him, defendant further admitted that he had sold marijuana from the vehicle in the past and had smoked some earlier in the day while in that car. Defendant also indicated that the officers could search the vehicle, but advised them that they might find a gun next to the driver’s side door “down by the seat.” He explained that the weapon belonged to a friend who “left it there a few weeks ago.” Defendant then informed Agent Hanlon, “I’ll get the keys,” spun around and moved briskly into the bedroom, closing the door behind him. Alarmed by the sudden movement and by what appeared a rapidly escalating situation, Agent Hanlon followed defendant through the door and observed him kneeling at the side of the bed. The officer ordered defendant to his feet and escorted him out to the kitchen area. Agent Han-lon then frisked and handcuffed defendant and informed him that the officers would seek a warrant for the apartment and car. Defendant again volunteered to retrieve *115 the keys to the Accord and after the officer led him back into the bedroom, he nodded to the bed and informed the officer the keys were between the mattress and box springs. The agent lifted up the mattress and found the keys. He then escorted defendant out of the apartment, put him in another patrol unit, and went to secure the warrants.
By the time Agent Hanlon arrived back at the apartment, Chandra Lewis and her roommate had also returned. They were accompanied by defendant’s brother who was dating Lewis’s roommate. The officers brought them all inside 14and sat them in the living room while they executed the warrant for the premises. During the search, Agent Hanlon retrieved a Ruger 40 millimeter semi-automatic handgun from under the bed where he had observed defendant kneeling earlier. According to the officer, he found the gun “within a hands reach” under the bed, less than a foot away from where he was located. The officer observed that the clip was loaded and that a round had been chambered. In addition, the officers found defendant’s identification and some marijuana in the bedroom. However, they did not find a weapon in the Honda despite defendant’s earlier statement, which Agent Han-lon took “as him being certain that he had one in his possession at some point during the day.” The agent testified that he questioned the occupants about the gun and they all denied any knowledge of the weapon.
Agent Hanlon testified as the sole witness in the state’s case in chief. For its part, the defense also called a single witness, a crime scene investigator for the Terrebonne Parish Sheriffs office who had examined the Ruger handgun at the request of the District Attorney’s office. The investigator was unable to identify any of the latent prints on the weapon and therefore could not establish that defendant had ever handled the gun. Defense counsel Knightshead focused on that testimony during closing argument, and on the state’s failure to call either Chandra Lewis or her roommate to testify with respect to ownership of the gun. He also invited jurors to consider other innocent explanations, including a bad back, for why Agent Hanlon found defendant kneeling by the side of the bed, which concealed the Ruger hidden under it on the floor, but also contained the ignition keys to the Honda that defendant had volunteered to obtain for the officer.
At the hearing on the motion for a new trial, the defense called Marcus Stoves, defendant’s life-long friend, who owned the gun in question and produced Ra receipt showing that he had purchased the handgun in 2000. In May 2004, Stoves, a member of the Louisiana National Guard, was deployed to Baghdad in Iraq. Because he could not bring the gun with him, Stoves decided to give it to Chandra Lewis, whom he had known even before she had begun dating defendant. The occasional visit of small children to his grandmother’s household, where Stoves resided, prompted him to give the gun to Lewis for safekeeping. Stoves testified that when he gave the firearm to Lewis, “the magazine was loaded but there wasn’t anything in the chamber.” Although Stoves had been redeployed back to Louisiana from Iraq by the time of trial, he was at Fort Polk in the process of demobilizing in October 2005, and could not have appeared at trial.
Chandra Lewis followed Stoves to the stand at the hearing and confirmed that he had given her the loaded Ruger which she then concealed underneath her bed without defendant’s knowledge. According to Lewis, she placed the gun as far as she could under the head ■ of bed against the wall “to where you have to get underneath *116 it to reach it .... you would have to actually lay down to get underneath to get it.” Once she placed the weapon under the bed, “that was it,” she never intentionally moved it from that location. The hiding place was among boxes and games also stored under the bed. Lewis estimated that she and defendant slept together in that bedroom two to three times a week over the course of their relationship and testified that she never traded bedrooms with her roommate to share with defendant’s brother. According to Lewis, the officers never asked her or the other occupants of the apartment about the ownership or possession of the gun. Unlike Stoves, Lewis would have been available to testify at defendant’s trial, had trial counsel subpoenaed her. However, although | ^defendant was out on bail pending trial, he did not tell her about the trial and Lewis did not receive a subpoena to appear in court.
Defense counsel Knightshead acknowledged at the hearing that he was fully aware of the exculpatory information that Stoves and Lewis possessed. In fact, he had prepared an affidavit for Stoves to execute in May 2005, several months before trial, attesting to his ownership of the gun and that he had given it to Lewis for safekeeping while he was in Iraq. However, the attorney testified that he made a strategic decision not to call Stoves and Lewis as witnesses because he felt that the state’s case was weak and that to do so would have established a link between the gun and defendant through his long-term relationship with Lewis and frequent use of her bedroom as to which neither the state nor the jury was otherwise aware. According to Knightshead, he discussed that strategy with his client and defendant had agreed to it. Defendant was also “emphatic” about not testifying at trial.
Under prompting by the state, Knights-head conceded that he had a second strategic reason for not calling either witness but was reluctant to disclose it because the information implicated the attorney-client privilege. After the court ruled that defendant had waived the privilege by asserting a claim of ineffective assistance, a ruling not disputed by defendant’s post-conviction counsel, Knightshead testified that defendant had confided to him that “he actually possessed the weapon.” Thus, “by calling anybody else to testify that they possessed the weapon,” the attorney feared that he would “be allowing perjured testimony to take place. And I just wasn’t going to do that.” Knights-head further testified that after speaking to defendant and Lewis, he knew “for certain she knew.”
17Finally, defendant testified at the hearing and denied that he ever told Knights-head that he possessed the firearm in question, or that he had agreed to a no-witness defense. As for his own testimony, defendant stated that he simply acceded to the advice of his attorney not to take the stand because Knightshead informed him that he generally did not “like to put his defendants on ... trial,” and that, because defendant was a convicted felon, “he didn’t think it was ... in my best interest to testify,” although the attorney then entered into a stipulation with the state for the jury that defendant was a convicted felon. According to defendant, his relationship with Knightshead had soured after they became embroiled in a dispute over the attorney’s fee. Under questioning by the state, defendant conceded he could not account for the fact that Agent Hanlon found the handgun not only with the magazine loaded but with a bullet chambered, although Stoves had testified that he had given the gun to Lewis with the chamber empty. Defendant also could not account for the agent’s ready access to *117 the gun simply by reaching under the bed, although Lewis testified that she had taken pains to shove it as far back as she could along the base of the headboard.
In denying the motion, the trial court noted that defendant was not entitled as a matter of La.C.Cr.P. art. 851(3) to a new trial on grounds of newly discovered evidence with respect to the exculpatory information possessed by Stoves and Lewis. Although Stoves had not been available for trial, the court considered Lewis the more important witness and she had been readily available to the defense. However, because Lewis was known to defense counsel and available for trial, the court considered whether Knightshead’s decision not to call her as a witness along with Stoves constituted ineffective assistance that would support the granting of a new trial in the interests of justice as a matter of La. C.Cr.P. art. |s851(5), although the court recognized that claims of ineffective assistance are ordinarily matters for post-conviction proceedings. The court observed that if Lewis had testified, given Agent Hanlon’s account that defendant had gone into the bedroom to retrieve his car keys which were, in fact, on or in the bed under which Lewis had concealed the weapon, ostensibly without defendant’s knowledge, that “it would have been extremely difficult for the jury to have ruled out a reasonable theory of innocence: that is, that Mr. Woodard had gone in the bedroom to get the car keys.” Thus, based on its review of the case, the court observed that “the jury, if it had had the information that was presented by Ms. Lewis and Mr. Stoves, most certainly could not have ruled out one reasonable theory of innocence; and that is that the gun belonged to Mr. Stoves, that it was in the possession of Ms. Lewis, that Mr. Woodard did not have any knowledge that the gun was there, and, therefore, he could not have been guilty of the crime charged.”
However, the court also noted the specific provision in La.C.Cr.P. art. 851 that a new trial shall not be granted on any ground unless the defendant shows that “an injustice has been done.” Accepting as credible Knightshead’s testimony about defendant’s admission, the court concluded, without specifically placing its ruling in the context of defendant’s ineffective assistance claim, that “[t]he jury’s verdict, despite all the shortcomings of the trial, appears to be just in that the defendant knew the gun was there.”
In reversing that ruling on appeal, the majority on the First Circuit panel observed that given the trial court’s conclusion that the testimony of Stoves (assuming he were available to testify) and Lewis would have changed the outcome of trial, “the prejudicial nature of the trial counsel’s deficiency in | (¡performance is evident .... and cannot be considered strategic.” Woodard, 07-0402 at 16.[1] Dissenting, Judge Whipple took the view that “the trial court considered [Knightshead’s] testimony for the proper purpose of determining whether effective assistance of counsel had been provided, i.e., whether *118 trial counsel had strategic reasons for not calling the witnesses noted by the defendant.” Woodard, 07-0402 at 2 (Whipple, J., dissenting). From that perspective, “the defendant failed to establish a deficiency in his trial counsel’s performance, preparation, and presentation of a defense, as would entitle him to a new trial.” Id.
A trial court’s judgment granting or denying a new trial in the interests of justice as a matter of La.C.Cr.P. art. 851(5) is ordinarily not subject to review, State v. Miller, 05-1111, p. 2 (La.3/10/06), 923 So.2d 625, 626; State v. Toomer, 395 So.2d 1320, 1328 (La.1981), and, as the trial court in the j^resent case acknowledged, claims of ineffective assistance of counsel are generally reserved for post-conviction proceedings. State v. Deloch, 380 So.2d 67, 68 (La.1980). Nevertheless, defendant expressly based his motion for a new trial on a claim of ineffective assistance of counsel, the trial court conducted a full evidentiary hearing on the question, and the court ultimately made its ruling that the interests of justice did not require a new trial in that context. The court of appeal thus properly addressed the trial court’s judgment as a ruling on the merits of 1^defendant's claim of ineffective assistance of counsel on a record adequate for that review. Cf. State v. Ratcliff, 416 So.2d 528, 530 (La.l982)(“[T]he trial judge held a hearing on the motion for a new trial during the course of which the allegation of ineffective assistance of counsel was explored in detail. Since the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, in the interest of judicial economy we will address the issue now.”).
However, we agree with Judge Whipple that the majority of the panel erred in assessing the probable impact of a defense based on the testimony of Stoves and Lewis within the analytical framework established by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) for resolving claims of ineffective assistance of counsel, under which a defendant must show both that his attorney’s performance was professionally unreasonable and that he was prejudiced by that conduct because it undermined confidence in the proper functioning of the adversary process, without regard to the ethical duty owed by Knightshead to the tribunal to avoid the knowing use of false evidence.
As a general rule “[w]hen examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitu-tionalize particular standards of professional conduct and thereby intrude into the state’s proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts.” Nix v. Whiteside, 475 U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986). However, with respect to the knowing use of false evidence, “virtually all of the sources speak with one voice.” Id., 475 U.S. at 166, 106 S.Ct. at 994. Louisiana is among that chorus of voices. See La. State Bar | nAss’n Rules of Professional Conduct, Rule 3.3(a)(3)(a lawyer shall not “offer evidence that the lawyer knows to be false.”); Rule 3.4(b)(a lawyer shall not “falsify evidence, counsel or assist a witness to testify falsely.... ”). “In short,” Whiteside observes, “the responsibility of an ethical lawyer as an officer of the court and a key component of a system of justice, dedicated to a search for truth, is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury. No system of justice worthy of the name can tolerate a lesser standard.” Id., 475 U.S. at 174, 106 S.Ct. *119 at 998; cf. Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971)(“Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.”).
Given that premise, the Supreme Court held in Whiteside that when defense counsel prevailed on the defendant not to testify that he saw the victim with a gun or something metallic in his hand, an assertion the attorney believed, on the basis of statements made to him by the defendant, would be absolutely false, he made an unassailable strategic decision under Strickland, although it detracted from defendant’s testimony that he killed in self-defense. “Whether he was persuaded or compelled to desist from perjury,” the Court observed, “Whiteside ha[d] no valid claim that confidence in the result of his trial ha[d] been diminished by his desisting from the contemplated perjury.” Id., 475 U.S. at 175, 106 S.Ct. at 998-99. The Court added that “[ejven if we were to assume that the jury might have believed his perjury, it does not follow that White-side was prejudiced.” Id., 475 U.S. at 175-76,106 S.Ct. at 999.
 112Thus, in the present case, to the extent that defendant’s claim of ineffective assistance of counsel rests on the assertion that he would have been acquitted, or at least would have had a reasonable likelihood of an acquittal, if he had been allowed to present false testimony, either in his own right or through Chandra Lewis, whom Knightshead was certain also knew defendant had taken possession of the weapon, he “claims a right the law simply does not recognize.” Id., 475 U.S. at 186, 106 S.Ct. at 1004 (Blackmun, J., concurring). With respect to Knights-head’s testimony concerning defendant’s admissions to him, the trial court’s credibility determination is subject to a deferential standard of review. State v. Hampton, 98-0331,- p. 18 (La.4/23/99), 750 So.2d 867, 884 (“As a general rule, deferential standards of review apply to factual and other trial determinations, while determinations of law are subject to de novo review.”).
However, we note that the trial court did not specifically address the credibility of Knightshead’s testimony that he was sure Chandra Lewis also knew defendant had taken possession of the gun. It is not clear from the attorney’s testimony whether his certainty in that regard stemmed from a direct assertion of fact by Lewis or from what he merely surmised was the truth in his conversations with the witness and defendant. In the latter case, nothing Stoves and Lewis had to say was necessarily known to be false by Knightshead or inconsistent with the possibility that Lewis subjectively but mistakenly believed she had successfully hidden the gun given to her by her friend for safekeeping while he was in Iraq, although defendant had in fact found the gun and taken possession of it. Cf. Whiteside, 475 U.S. at 189, 106 S.Ct. at 1005 (“Except in the rarest of cases, attorneys who adopt the role of the judge or jury to determine the facts pose a | isdanger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment.”)(Blackmun, J., concurring) (internal quotation marks, citation, and footnote omitted).
 Nevertheless, even assuming ar-guendo that an attorney may ethically present a defense he knows is false based on the testimony of witnesses who believe it true, Knightshead did not err professionally in deciding not to call Stoves and Lewis at trial. The attorney faced not only evidence that defendant was observed in immediate proximity of the gun shortly before his arrest but also defendant’s ad *120 mission to Agent Hanlon that he had been driving around with a firearm stored in his car for several weeks after another friend had given it to him for safekeeping, virtually a confession to the offense. Cf. State v. Major, 03-3522, p. 8 (La.12/1/04), 888 So.2d 798, 802 (“The evidence at trial established that defendant had exercised dominion and control over the cocaine hidden underneath the dashboard of the car by virtue of his dominion and control over the vehicle as the driver and professed renter”)- Knightshead could reasonably decide not to focus jurors’ attention on that admission by presenting evidence inviting them to consider the long odds that another of defendant’s friends, a lifetime acquaintance, had entrusted another gun to his longtime girlfriend for safekeeping in the room he frequently used, under circumstances in which the gun had apparently moved from its original hiding place and in which a round had been chambered after Stoves had given it to Lewis, who had no further use for it, all ostensibly without his knowledge. That a particular strategy fails does not mean that it was professionally unreasonable. State v. Felde, 422 So.2d 370, 393 (La.1982).
In these circumstances, we are persuaded that even if he could have ethically offered the testimony of Stoves and Lewis, counsel’s strategic decision [ 14not to do so and to rely on exploiting any weaknesses in the state’s case was not only one that any reasonably competent attorney practicing criminal law could have made but also one that did not prejudice the defendant by undermining the adversary process counted on to produce a just and reliable result. Strickland, 466 U.S. at 687,104 S.Ct. at 2064.
Accordingly, the decision of the court of appeal is reversed, defendant’s conviction and sentence are reinstated,[2] and this case is remanded to the district court for execution of sentence.
DECISION OF COURT OF APPEAL REVERSED; DEFENDANT’S CONVICTION AND SENTENCE REINSTATED; CASE REMANDED.
JOHNSON, J., dissents.

. As an additional ground for granting defendant relief, post-conviction counsel argued below, and he contends here, that Knightshead also rendered ineffective assistance by failing to submit special requested charges to the court refining the elements of constructive possession for jurors to emphasize that defendant's mere proximity to the handgun did not mean, without his awareness of its presence and his intent to possess it, that he had dominion and control over the weapon. However, defendant did not allege the error in his motion for a new trial and the trial court did not address it in ruling on the motion. Accordingly, the court of appeal majority specifically declined to address this claim in its decision because it was not properly raised in the trial court, Woodard, 07-0402 at 11-12, and we do not consider it here.

. However, the district court is directed to amend the sentence to delete the requirement that defendant serve an additional year imprisonment on default of payment of fine and court costs "at hard labor.” See Woodard, 07-0402, p. 2, n. 2 (Whipple, J., dissenting)(La.C.Cr.P. art. 884 authorizes only "imprisonment” not "imprisonment at hard labor” in default of payment of fine and costs)(citing State v. Banks, 97-2257, p. 7 (La.App. 1st Cir.9/25/98), 721 So.2d 24, 27 writ denied, 98-3210 (La.4/23/99), 742 So.2d 877).